IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

ESTATE OF SERAFIN FINN, by and through its personal representative Melissa R. Schwartz,

    Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality;
DEPUTY JASON GENTEMPO, in his individual capacity;

    Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

The Estate of Serafin Finn, by and through its attorneys Nicholas Lutz, Matthew Cron, and Omeed Azmoudeh of RATHOD | MOHAMEDBHAI LLC and Benjamin Hartford of the Law Office of Benjamin Hartford, alleges as follows:

### I. INTRODUCTION

1. This case centers on the gratuitous assault of an arrestee while he was handcuffed, shackled, and restrained in a wheelchair.

2. On March 20, 2019, Deputy Jason Gentempo of the Denver Sheriff's Department was responsible for transporting Serafin Finn from a Denver hospital to a Denver jail.

3. Deputy Gentempo found Mr. Finn at the hospital. He was already handcuffed and shackled. Deputy Gentempo placed Mr. Finn in a wheelchair.

4.      While Deputy Gentempo wheeled Mr. Finn out of the hospital and towards his vehicle, Deputy Gentempo alleges that Mr. Finn attempted to spit at him. In response, Deputy Gentempo reared back with the full force of his body and punched Mr. Finn in the face.

5.      Deputy Gentempo punched Mr. Finn in the face several more times. He then flipped Mr. Finn's wheelchair, smashing Mr. Finn's head to the ground. Deputy Gentempo then laid on top of Mr. Finn and applied painful pressure points to his head and neck.

6.      All of this force occurred while Mr. Finn's legs and arms were completely restrained, and he was unable to protect himself against Deputy Gentempo's ongoing assault.

7.      Deputy Gentempo's assault resulted in extensive injuries, including hematomas and abrasions on Mr. Finn's head.

8.      Surveillance footage captured the entire sequence of events.

9.      In April 2020, following a thorough investigation of the matter, the Internal Affairs Bureau recommended that Deputy Gentempo receive discipline for three separate policy violations:  employing excessive force;  lying in his written report of the incident;  and lying to investigators.

10.     Despite the findings of the Internal Affairs Bureau, the Denver Sheriff's Department rejected the recommendation and exonerated Deputy Gentempo. The Denver Sheriff's Department also terminated the lead investigator on the matter following her attempt to publicize the sham disciplinary process.

11.     The beating of this defenseless arrestee in violation of his clearly established constitutional rights was a wholly predictable outcome. By his own admission, Deputy Gentempo had received no training on the use of force against allegedly spitting arrestees;  had

received no discipline following several prior accusations of excessive force; and works in a law enforcement agency where officers know that their agency is likely to endorse their conduct if they employ excessive force, just as the Denver Sheriff's Department did here.

## II.　JURISDICTION

12.　This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

13.　Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All the events and omissions alleged herein occurred within the State of Colorado, and all Defendants reside in this district.

## III.　PARTIES

14.　Serafin Finn was a resident of the State of Colorado who died from unrelated causes following the constitutional violations alleged herein. Melissa R. Schwartz, the Public Administrator for the City and County of Denver, is the Special Administrator appointed pursuant to C.R.S. § 15-12-614, *et seq.*, representing the Estate of Serafin Finn. Marcie R. McMinimee, the Deputy Public Administrator for the City and County of Denver, is the Alternate Special Administrator appointed pursuant to C.R.S. § 15-12-614, *et seq.*, acting as a fiduciary in support of Ms. Schwartz as needed.

15.　Defendant City and County of Denver ("Denver") is a municipality organized under Colorado law and is a "person" subject to suit under 42 U.S.C. § 1983. Defendant Denver was at all relevant times the employer of Defendant Jason Gentempo.

16. At all relevant times, Defendant Jason Gentempo was a resident of Colorado, acting under color of state law in his capacity as a law enforcement officer employed by Defendant Denver.

## IV. FACTUAL BACKGROUND

*The Brutal Assault of Mr. Finn*

17. On March 20, 2019, due to an internal error, Mr. Finn was released from the Denver Detention Center ("DDC") with an active warrant still pending.

18. Upon release, Mr. Finn experienced a medical emergency and was taken via ambulance to Denver Health Medical Center ("Denver Health").

19. While Mr. Finn received treatment, the Denver Sheriff's Department ("DSD") discovered his active warrant, and DSD deputies at the hospital arranged to transport Mr. Finn back to the jail after his treatment ended.

20. That evening, Deputy Gentempo, and his partner, Deputy Purna Siwakoti, were assigned to Scout Car 2, which handles inmate transportation between Denver Health and DDC. Accordingly, Deputies Gentempo and Siwakoti were tasked with transporting Mr. Finn back to the DDC.

21. When Deputies Gentempo and Siwakoti arrived at Denver Health, they found Mr. Finn in ankle-shackles and handcuffs on a gurney in an examination room.

22. Deputies Gentempo and Siwakoti ordered Mr. Finn to get down from the gurney and into a heavy-duty hospital wheelchair.

23. Mr. Finn complied with their order, still shackled and handcuffed and now seated in a wheelchair.

24. Deputies Gentempo and Siwakoti rolled Mr. Finn out of the examination room and then out of the hospital through a nearby exit.

25. Once outside the hospital, Deputy Siwakoti rotated Mr. Finn's wheelchair and led it backwards down a long concrete ramp towards Scout Car 2, which was parked nearby. Deputy Gentempo followed closely behind, facing Deputy Siwakoti and Mr. Finn.

26. When they reached the bottom of the ramp, Deputy Siwakoti again rotated Mr. Finn's wheelchair and now walked on the right side of Mr. Finn as they continued towards Scout Car 2. Deputy Gentempo started walking on the left side of Mr. Finn.

27. As they proceeded towards the vehicle, Denver Health surveillance footage shows Mr. Finn turn towards Deputy Gentempo and appear to spit in his direction. In later interviews, Mr. Finn did not recall whether he spat.

28. Deputy Gentempo suddenly reared back and punched Mr. Finn as hard as he could with a closed fist, striking Mr. Finn in the face from close range.

29. At the time Deputy Gentempo struck Mr. Finn, Mr. Finn was handcuffed and shackled in a wheelchair and posed no physical threat to the deputies, nor was he able to protect himself from the blow.

30. The force of the strike propelled Mr. Finn's head backwards.

31. Deputy Gentempo then proceeded to strike Mr. Finn in the face multiple times in rapid succession.

32. After striking Mr. Finn several times, Deputy Gentempo grabbed Mr. Finn's head and neck, drove his wheelchair backwards several feet, and flipped it over its rear wheels, smashing Mr. Finn's head to the ground.

5

33. As Mr. Finn lay incapacitated on the ground, shackled and handcuffed, suffering from the pain of the assault, Deputy Gentempo still proceeded to attack him.

34. Deputy Gentempo got on top of Mr. Finn and began squeezing Mr. Finn's face and neck, applying a DSD-approved mandibular angle pressure point.

35. He applied this pressure point for nearly two minutes until other DSD deputies arrived.

36. Eventually, Deputies Gentempo and Siwakoti picked Mr. Finn up from the ground by his arms, while other deputies placed a spit sock over Mr. Finn's head.

37. As they moved him, they smashed Mr. Finn's head into a parking bollard.

38. At no time did Mr. Finn represent a physical threat to Deputies Gentempo or Swiakoti.

39. Deputy Gentempo's use of force against Mr. Finn was wholly unjustified and excessive.

40. Deputy Gentempo and another deputy took Mr. Finn to a DSD vehicle and placed him in a caged area inside the rear doors.

41. In violation of DSD policy, Deputy Gentempo did not arrange a health screening for Mr. Finn after securing Mr. Finn in the vehicle. This was because, in Deputy Gentempo's own words, "my main focus was taking care of myself."

42. Shortly after, Deputies Gentempo and Siwakoti transported Mr. Finn to the DDC where Deputy Gentempo again failed to inform any medical staff that he had used force against Mr. Finn and otherwise took no measures to ensure that Mr. Finn was evaluated for injuries.

43. As Mr. Finn sat in the intake department, he began seizing and collapsed to the concrete floor. As a result, he was placed in the medical unit where he remained for almost two days.

44. Even during his stay in the medical unit, Mr. Finn was not evaluated for injuries that resulted from Deputy Gentempo's attack.

45. It was not until Mr. Finn reported Deputy Gentempo's misconduct on March 22, 2019, two days after the attack, that he was finally evaluated for his injuries.

46. At that time, a nurse employed in the jail observed a hematoma and abrasions still visible on Mr. Finn's head, clearly the result of being assaulted by Deputy Gentempo.

*DSD's Cover-Up and Ratification of Deputy Gentempo's Assault*

47. On March 22, 2019, Mr. Finn contacted Denver's Office of the Independent Monitor to report Deputy Gentempo's beating.

48. Mr. Finn's complaint was referred to the Internal Affairs Bureau ("IAB"), and the case was assigned to Senior Investigator Brittany Iriart.

49. Throughout March and April of 2020, Investigator Iriart conducted interviews with several people involved in the assault, including Mr. Finn, Deputies Gentempo and Siwakoti, another DSD Sergeant, and a night shift supervisor at Denver Health.

50. During their interviews, neither Deputy Gentempo nor Siwakoti reported the use of force. Instead, Deputy Gentempo consistently denied that he had struck Mr. Finn, ignored or mischaracterized the video evidence, and outright lied regarding his treatment of Mr. Finn.

51. For example, Deputy Gentempo denied "intentionally strik[ing] [Mr. Finn] with a closed fist," and stated only that he had "closed the distance to prevent [Mr. Finn] from spitting again."

52. And again, when confronted with the video evidence, Deputy Gentempo explained, "I would not even classify it as a strike . . . Yeah, I wouldn't classify it as a strike."

53. Meanwhile, other officers who reviewed the surveillance footage of the attack identified his use of force as a strike and understood that Deputy Gentempo should have reported the assault.

54. For example, a DSD Sergeant stated, "I would say it was a strike . . . he struck something," and "yes," Deputy Gentempo should have reported the strike.

55. On April 20, 2020, DSD IAB filed a complaint against Deputy Gentempo, alleging three separate policy violations: Inappropriate Force on a Person (RR-300.22) for his assault of Mr. Finn; Knowingly Making Misleading or Inaccurate Statements (RR-200.4.1) for lying in his written report following the assault; and Commission of a Deceptive Act (RR-200.4.2) for lying about his conduct during his interview with Investigator Iriart.[1]

56. In its final report, DSD IAB described Deputy Gentempo's conduct as follows:

"Deputy Gentempo responded by striking toward inmate Finn twice in the face area, while Inmate Finn appeared to block the strikes with the blanket he had in his possession, literally a split second later [] Deputy Gentempo took a bracing step onto his left leg, cocked his left arm back, and followed through with his left arm as his left foot left the ground; then Deputy Gentempo immediately took a second swing at Inmate Finn's face area. . . . Deputy Gentempo then pushed Inmate Finn by the head/neck area with his left hand, pushing him hard enough to cause the wheelchair to roll backward a few feet and fall backward to the ground."

---

[1] These policy violations reference provisions in DSD's Rules and Regulations.

57. Three days later, on April 23, 2020, the DSD Conduct Review Unit determined that "the allegations against [Deputy Gentempo] regarding the asserted policy and procedural violations are Not Sustained."

58. The stated rationale for this determination was that "There [was] insufficient evidence to either prove or disprove the allegation[s]."

59. The DSD's determination is incomprehensible—video evidence clearly shows Deputy Gentempo repeatedly striking Mr. Finn in the face, flipping his wheelchair, then applying painful pressure points to his face and neck, even though Mr. Finn was entirely defenseless.

60. The DSD's determination whitewashes and ratifies Deputy Gentempo's misconduct.

61. Shortly after, Investigator Iriart attempted to publicize the DSD's unfounded decision to exonerate Deputy Gentempo, along with its more general practice of covering up the misconduct of its officers.

62. The DSD suspended Investigator Iriart's employment in June 2020, and ultimately terminated her in October 2020.

63. The DSD's decision to silence the whistleblower responsible for the investigation of Deputy Gentempo makes clear that the DSD endorses and ratifies Deputy Gentempo's unjustified assault of Mr. Finn.

***The DSD's Failure to Train, Supervise, or Discipline Deputy Gentempo***

64. In addition to ratifying Deputy Gentempo's misconduct, the DSD also failed to train, supervise, and discipline Deputy Gentempo prior to his assault of Mr. Finn.

65. Deputy Gentempo admitted during the IAB investigation that he had not been trained on the use of force in situations involving arrestees that allegedly attempt to spit at or near officers.

66. In Deputy Gentempo's own words: "I'm not trying to justify anything. All I'm trying to say is there was no layout, there's nothing in our policy that will tell you what exactly to do when you're being spit on."

67. Even if such training existed, Deputy Gentempo admitted he had not reviewed or signed 1,631 policy documents contained in DSD's employee training database.

68. Separately, the beating of Mr. Finn was not the first time that the DSD failed to discipline Deputy Gentempo.

69. In September 2017, a jail inmate accused Deputy Gentempo of using inappropriate force to restrain him during an incident in the jail.

70. In October 2017, another inmate accused Deputy Gentempo of physically assaulting him following an altercation with another inmate.

71. In June 2018, another inmate accused Deputy Gentempo of kicking him to the ground while he was being transferred from Denver Health to the DDC.

72. And in May 2020, yet another inmate accused Deputy Gentempo of pushing him to the floor in his cell—that inmate was then transferred to Denver Health, bleeding from his face.

73. The DSD did not discipline Deputy Gentempo for any of these acts.

***The DSD's Widespread Practice of Employing Excessive Force and Failing to Discipline its Officers***

74. The DSD has a custom of using excessive force against its constituents and frequently failing to discipline its officers for such.

75. In or around 2020, DSD Deputy Kevin Bagley punched an inmate several times in the head, even while the inmate was on the ground. As in this case, punching defenseless inmates in the head constitutes the use of excessive force.

76. In or around November 2021, a DSD Deputy used excessive force against an inmate who refused to remove his hair tie. No force was necessary during that non-violent interaction.

77. In or around 2020, DSD Deputy Ian Schiffhauer grabbed an arrestee's neck and continued to apply pressure to the man's neck after taking him to the ground. As in this case, continuing to attack defenseless inmates constitutes the use of excessive force.

78. In or around 2020, DSD Sergeant James Casias shoved an inmate to the ground. A sergeant employing excessive force sends a clear message from the top to the remaining DSD officers of what conduct is tolerable.

79. In or around 2020, DSD Deputy Denise Valdez stood on an inmate's legs without reasonable justification and received no discipline. Standing on an inmate's legs is neither necessary nor DSD-approved.

80. In or around 2012, DSD Deputy Brady Lovingier slammed a pre-trial detainee's head into a courtroom wall.

81. Throughout his employment, at least five inmates have accused Deputy Gentempo of using excessive force; however, Deputy Gentempo has never been disciplined for any of these transgressions.

82. In addition, DSD has a widespread and longstanding policy and practice of altering IAB findings in order to exonerate deputies who IAB determined had violated DSD policy and to prevent the public from learning about DSD employee misconduct.

83. Investigator Iriart was aware of this policy and practice and in at least one instance voiced her complaints about this process to the public. Investigator Iriart also complained to her DSD superiors about this policy and practice. However, DSD took no meaningful action to remedy her complaints.

***A Summation of Denver's Customs, Policies, and Practices That Were the Moving Forces Behind Deputy Gentempo's Constitutional Violations Against Mr. Finn***

84. Denver's customs, policies, and practices were the moving forces behind Deputy Gentempo's use of excessive force against Mr. Finn.

85. Denver carried out these customs, policies, and practices with deliberate indifference, making the constitutional violation against Mr. Finn predictable and almost inevitable.

86. Such customs, policies, and practices include the ratification of Deputy Gentempo's beating of Mr. Finn; the failure to train or supervise Deputy Gentempo with respect to the use of force against allegedly spitting arrestees; the failure to discipline Deputy Gentempo with respect to previous accusations of excessive force; and the widespread practice of its officers employing excessive force and frequently receiving no disciplinary actions. These customs, policies, and practices are detailed in the preceding paragraphs and summarized below.

87. Denver ratified Deputy Gentempo's constitutional violation by rejecting the IAB's recommendation of disciplinary action. Instead, Denver exonerated Deputy Gentempo and went on to silence a whistleblower who flagged the failure to discipline Deputy Gentempo as part of a much wider practice of exonerating officers who committed misconduct.

88. Denver failed to train or supervise Deputy Gentempo since, as he admits, he received no training on the use of force against allegedly spitting arrestees.

89. Denver failed to discipline Deputy Gentempo for several other accusations of excessive force leading up to the beating of Mr. Finn.

90. Denver has a custom of employing excessive force and frequently failing to discipline its officers that constitutes a widespread practice, as evidenced by the numerous incidents identified above involving DSD officers other than Deputy Gentempo, Deputy Gentempo's own disciplinary history, and Investigator Iriart's chief complaint.

91. These customs, policies, and practices were consciously permitted, authorized, or executed by Denver. They reflect an intentional decision to choose from among various alternative courses of action.

92. They were also the cause of the constitutional violation alleged herein. Deputy Gentempo had not been trained for the situation at issue, had not received discipline in the past for similar misconduct, and knew that even if he employed excessive force against Mr. Finn, it likely would be tolerated by DSD. Thus, it was entirely foreseeable that Deputy Gentempo would continue to use excessive force against inmates and arrestees, including Mr. Finn.

93. The actions were approved, condoned, and ratified by Denver, deprived Mr. Finn of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and resulted in substantial injuries recoverable by the Estate of Mr. Finn.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment Excessive Force
### (Against Deputy Gentempo)

94. Plaintiff hereby incorporates all other paragraphs of this Complaint as if set forth herein.

95. Defendant Deputy Gentempo, at all times relevant hereto, was acting under color of state law in his capacity as a law enforcement officer.

96. At the time of his arrest, Mr. Finn had a clearly established right under the Fourth Amendment to the United States Constitution to be secure in his person against unreasonable searches and seizures, including through the use of excessive force in carrying out a seizure of his person.

97. Defendant Deputy Gentempo's repeated strikes to Mr. Finn's face, his shove of Mr. Finn to the ground, his application of painful pressure points to Mr. Finn's head and neck, and his gratuitous bump of Mr. Finn's head into a parking bollard were objectively unreasonable under the circumstances.

98. Such misconduct was particularly unreasonable given that, at all relevant times, Mr. Finn was handcuffed, shackled, and restrained in a wheelchair. He was completely defenseless and posed no physical threat to the officers.

99. Defendant Deputy Gentempo's conduct violated clearly established rights belonging to Mr. Finn of which any reasonable law enforcement officer knew or should have known.

100. Defendant Deputy Gentempo's actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Mr. Finn's federally protected rights, and he engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Finn's constitutionally protected rights.

101. Evidence of such malice, recklessness, and callous indifference includes the violent nature of the assault itself, along with Deputy Gentempo's deception and complete lack of remorse during the ensuing investigation.

102. The unlawful acts herein described were carried out pursuant to the customs, policies, and practices of Defendant Denver.

103. Defendant Denver carried out these customs, policies, and practices with deliberate indifference, making the constitutional violation against Mr. Finn predictable and almost inevitable.

104. Such customs, policies, and practices include the ratification of Deputy Gentempo's beating of Mr. Finn; the failure to train or supervise Deputy Gentempo with respect to the use of force against allegedly spitting arrestees; the failure to discipline Deputy Gentempo with respect to previous accusations of excessive force; and the widespread practice of excessive force and frequent sham disciplinary processes related to such.

105. The acts or omissions of each Defendant, including the unconstitutional customs, policies, and practices described herein, were a legal and proximate cause of Plaintiff's damages.

106. Because Defendant Denver's customs, policies, and practices were the moving forces behind Deputy Gentempo's constitutional violations, his misconduct is chargeable to the municipality.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Ratification, Failure to Train or Supervise, Failure to Discipline, and Widespread Unlawful Practices**
**(Against Defendant Denver)**

107. Plaintiff hereby incorporates all other paragraphs of this Complaint as if set forth herein.

108. Defendant Denver ratified the unlawful use of excessive force alleged herein, failed to train and supervise Defendant Deputy Gentempo, failed to discipline him for similar misconduct prior to the unlawful conduct alleged herein, and perpetuated a widespread practice of excessive force and frequent cover-ups.

109. These customs, policies, and practices were the driving forces and proximate causes of Defendant Deputy Gentempo's constitutional violations against Mr. Finn.

110. Defendant Denver was deliberately indifferent to the constitutional rights of Mr. Finn, knowing that its customs, policies, and practices would inevitably result in the excessive force employed by Defendant Deputy Gentempo.

111. The acts or omissions of Defendant Denver caused Mr. Finn to suffer extreme physical and mental pain during the assault.

112. The acts or omissions of Defendant Denver were a legal and proximate cause of Plaintiff's damages.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in its favor, and against each Defendant, for the following relief:

a. All declaratory relief and injunctive relief, as appropriate;

b. Actual economic damages as established at trial;

c. Compensatory damages, including but not limited to those for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, medical bills, and other non-pecuniary losses;

d. Nominal damages;

e. Punitive damages for all claims as allowed by law in an amount to be determined at trial;

f. Pre-judgment and post-judgment interest at the highest lawful rate;

g. The maximum tax-offset permitted by law;

h. Attorneys' fees and costs; and

i. Such further relief as justice requires, and any other relief as allowed by law.

## VII. JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

DATED this 10th date of August 2021.

                              RATHOD | MOHAMEDBHAI LLC

                              *s/ Nicholas A. Lutz*
                              Nicholas Lutz
                              Matthew Cron
                              Omeed Azmoudeh
                              2701 Lawrence Street, Suite 100
                              Denver, Colorado 80205
                              (303) 578-4400
                              nl@rmlawyers.com
                              mc@rmlawyers.com
                              oa@rmlawyers.com

                              THE LAW OFFICE OF BENJAMIN HARTFORD

                              *s/ Benjamin Hartford*
                              Benjamin Hartford
                              650 S. Cherry Street, Suite 1225
                              Glendale, Colorado 80246
                              (303) 991-5757
                              ben@bhartfordlaw.com