**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-02160-RMR

ESTATE OF SERAFIN FINN, by and through its personal representative Melissa R. Schwartz,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality;
DEPUTY JASON GENTEMPO, in his individual capacity;

     Defendants.

_____

**FIRST AMENDED COMPLAINT AND JURY DEMAND**
_____

The Estate of Serafin Finn, by and through its attorneys Nicholas Lutz, Matthew Cron, and Omeed Azmoudeh of RATHOD | MOHAMEDBHAI LLC and Benjamin Hartford of the Law Office of Benjamin Hartford, alleges as follows:

## I.     <u>INTRODUCTION</u>

1.     This case centers on the gratuitous assault of an arrestee while he was handcuffed, shackled, and restrained in a wheelchair.

2.     On March 20, 2019, Deputy Jason Gentempo of the Denver Sheriff's Department was responsible for transporting Serafin Finn from a Denver hospital to a Denver jail.

3.     Deputy Gentempo found Mr. Finn at the hospital. He was already handcuffed and shackled. Deputy Gentempo placed Mr. Finn in a wheelchair.

1

4.      While Deputy Gentempo wheeled Mr. Finn out of the hospital and towards his vehicle, Deputy Gentempo alleges that Mr. Finn attempted to spit at him.  In response, Deputy Gentempo reared back with the full force of his body and punched Mr. Finn in the face.

5.      Deputy Gentempo punched Mr. Finn in the face several more times.  He then flipped Mr. Finn's wheelchair, smashing Mr. Finn's head to the ground.  Deputy Gentempo then laid on top of Mr. Finn and applied painful pressure points to his head and neck.

6.      All of this force occurred while Mr. Finn's legs and arms were completely restrained, and he was unable to protect himself against Deputy Gentempo's ongoing assault.

7.      Deputy Gentempo's assault resulted in extensive injuries, including hematomas and abrasions on Mr. Finn's head.

8.      Surveillance footage captured the entire sequence of events.

9.      In April 2020, following a thorough investigation of the matter, the Internal Affairs Bureau recommended that Deputy Gentempo receive discipline for three separate policy violations:  employing excessive force; lying in his written report of the incident; and lying to investigators.

10.      Despite the findings of the Internal Affairs Bureau, the Denver Sheriff's Department rejected the recommendation and exonerated Deputy Gentempo.  The Denver Sheriff's Department also terminated the lead investigator on the matter following her attempt to publicize the sham disciplinary process.

11.      The beating of this defenseless arrestee in violation of his clearly established constitutional rights was a wholly predictable outcome.  By his own admission, Deputy Gentempo had received no training on the use of force against allegedly spitting arrestees; had

2

received no discipline following several prior accusations of excessive force; and works in a law enforcement agency where officers know that their agency is likely to endorse their conduct if they employ excessive force, just as the Denver Sheriff's Department did here.

## II.    JURISDICTION

12.    This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.  Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

13.    Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All the events and omissions alleged herein occurred within the State of Colorado, and all Defendants reside in this district.

## III.    PARTIES

14.    Serafin Finn was a resident of the State of Colorado who died from unrelated causes following the constitutional violations alleged herein.  Melissa R. Schwartz, the Public Administrator for the City and County of Denver, is the Special Administrator appointed pursuant to C.R.S. § 15-12-614, *et seq.*, representing the Estate of Serafin Finn.  Marcie R. McMinimee, the Deputy Public Administrator for the City and County of Denver, is the Alternate Special Administrator appointed pursuant to C.R.S. § 15-12-614, *et seq.*, acting as a fiduciary in support of Ms. Schwartz as needed.

15.    Defendant City and County of Denver ("Denver") is a municipality organized under Colorado law and is a "person" subject to suit under 42 U.S.C. § 1983.  Defendant Denver was at all relevant times the employer of Defendant Jason Gentempo.

3

16. At all relevant times, Defendant Jason Gentempo was a resident of Colorado, acting under color of state law in his capacity as a law enforcement officer employed by Defendant Denver.

## IV. FACTUAL BACKGROUND

*The Brutal Assault of Mr. Finn*

17. On March 20, 2019, due to an internal error, Mr. Finn was released from the Denver Detention Center ("DDC") with an active warrant still pending.

18. Upon release, Mr. Finn experienced a medical emergency and was taken via ambulance to Denver Health Medical Center ("Denver Health").

19. While Mr. Finn received treatment, the Denver Sheriff's Department ("DSD") discovered his active warrant, and DSD deputies at the hospital arranged to transport Mr. Finn back to the jail after his treatment ended.

20. That evening, Deputy Gentempo, and his partner, Deputy Purna Siwakoti, were assigned to Scout Car 2, which handles inmate transportation between Denver Health and DDC. Accordingly, Deputies Gentempo and Siwakoti were tasked with transporting Mr. Finn back to the DDC.

21. When Deputies Gentempo and Siwakoti arrived at Denver Health, they found Mr. Finn in ankle-shackles and handcuffs on a gurney in an examination room.

22. Deputies Gentempo and Siwakoti ordered Mr. Finn to get down from the gurney and into a heavy-duty hospital wheelchair.

23. Mr. Finn complied with their order, still shackled and handcuffed and now seated in a wheelchair.

4

24.    Deputies Gentempo and Siwakoti rolled Mr. Finn out of the examination room and then out of the hospital through a nearby exit.

25.    Once outside the hospital, Deputy Siwakoti rotated Mr. Finn's wheelchair and led it backwards down a long concrete ramp towards Scout Car 2, which was parked nearby.  Deputy Gentempo followed closely behind, facing Deputy Siwakoti and Mr. Finn.

26.    When they reached the bottom of the ramp, Deputy Siwakoti again rotated Mr. Finn's wheelchair and now walked on the right side of Mr. Finn as they continued towards Scout Car 2.  Deputy Gentempo started walking on the left side of Mr. Finn.

27.    As they proceeded towards the vehicle, Denver Health surveillance footage shows Mr. Finn turn towards Deputy Gentempo and appear to spit in his direction.  In later interviews, Mr. Finn did not recall whether he spat.

28.    Deputy Gentempo suddenly reared back and punched Mr. Finn as hard as he could with a closed fist, striking Mr. Finn in the face from close range.

29.    At the time Deputy Gentempo struck Mr. Finn, Mr. Finn was handcuffed and shackled in a wheelchair and posed no physical threat to the deputies, nor was he able to protect himself from the blow.

30.    The force of the strike propelled Mr. Finn's head backwards.

31.    Deputy Gentempo then proceeded to strike Mr. Finn in the face multiple times in rapid succession.

32.    After striking Mr. Finn several times, Deputy Gentempo grabbed Mr. Finn's head and neck, drove his wheelchair backwards several feet, and flipped it over its rear wheels, smashing Mr. Finn's head to the ground.

5

33.    As Mr. Finn lay incapacitated on the ground, shackled and handcuffed, suffering from the pain of the assault, Deputy Gentempo still proceeded to attack him.

34.    Deputy Gentempo got on top of Mr. Finn and began squeezing Mr. Finn's face and neck, applying a DSD-approved mandibular angle pressure point.

35.    He applied this pressure point for nearly two minutes until other DSD deputies arrived.

36.    Eventually, Deputies Gentempo and Siwakoti picked Mr. Finn up from the ground by his arms, while other deputies placed a spit sock over Mr. Finn's head.

37.    As they moved him, they smashed Mr. Finn's head into a parking bollard.

38.    At no time did Mr. Finn represent a physical threat to Deputies Gentempo or Swiakoti.

39.    Deputy Gentempo's use of force against Mr. Finn was wholly unjustified and excessive.

40.    Deputy Gentempo and another deputy took Mr. Finn to a DSD vehicle and placed him in a caged area inside the rear doors.

41.    In violation of DSD policy, Deputy Gentempo did not arrange a health screening for Mr. Finn after securing Mr. Finn in the vehicle.   This was because, in Deputy Gentempo's own words, "my main focus was taking care of myself."

42.    Shortly after, Deputies Gentempo and Siwakoti transported Mr. Finn to the DDC where Deputy Gentempo again failed to inform any medical staff that he had used force against Mr. Finn and otherwise took no measures to ensure that Mr. Finn was evaluated for injuries.

43.    As Mr. Finn sat in the intake department, he began seizing and collapsed to the concrete floor.  As a result, he was placed in the medical unit where he remained for almost two days.

44.    Even during his stay in the medical unit, Mr. Finn was not evaluated for injuries that resulted from Deputy Gentempo's attack.

45.    It was not until Mr. Finn reported Deputy Gentempo's misconduct on March 22, 2019, two days after the attack, that he was finally evaluated for his injuries.

46.    At that time, a nurse employed in the jail observed a hematoma and abrasions still visible on Mr. Finn's head, clearly the result of being assaulted by Deputy Gentempo.

***Denver's Policy of Altering Investigatory Findings to Cover Up Misconduct***

47.    On March 22, 2019, Mr. Finn contacted Denver's Office of the Independent Monitor to report Deputy Gentempo's beating.

48.    Mr. Finn's complaint was referred to the Administrative Investigations Unit of the DSD's Public Integrity Division,[1] and the case was assigned to Senior Administrative Investigator Brittany Iriart.

49.    As an administrative investigator, Ms. Iriart's role was to investigate allegations of misconduct by DSD deputies.

50.    Administrative investigators like Ms. Iriart complete their investigations by collecting evidence, interviewing the subject of the investigation and potential witnesses to the

---

[1] The Administrative Investigations Unit in the Public Integrity Division was previously known as the Denver Sheriff Department Internal Affairs Bureau.

relevant conduct, and ultimately drafting a report of their findings for submission to DSD's

Conduct Review Unit.

51.     Once a report is submitted to the Conduct Review Unit, an analyst in that

department authors a Review and Findings Report.  Then, the director of the Conduct Review

Unit and the Office of the Independent Monitor recommend a course of disciplinary action.

52.     If the Conduct Review Unit and the Office of the Independent Monitor

recommend that a deputy be disciplined, the DSD conducts a Contemplation of Discipline

Hearing.

53.     The Contemplation of Discipline Hearing committee members bear ultimate

responsibility for deciding whether and what discipline to impose in a particular case.

54.     Throughout March and April of 2020, Investigator Iriart conducted interviews

with several people involved in the assault, including Mr. Finn, Deputies Gentempo and

Siwakoti, DSD Sergeant Herman Peeper, and a night shift supervisor at Denver Health.

55.     During their interviews, neither Deputy Gentempo nor Siwakoti reported the use

of force.  Instead, Deputy Gentempo consistently denied that he had struck Mr. Finn, ignored or

mischaracterized the video evidence, and outright lied regarding his treatment of Mr. Finn.

56.     For example, Deputy Gentempo denied "intentionally strik[ing] [Mr. Finn] with a

closed fist," and stated only that he had "closed the distance to prevent [Mr. Finn] from spitting

again."

57.     And again, when confronted with the video evidence, Deputy Gentempo

explained, "I would not even classify it as a strike . . . Yeah, I wouldn't classify it as a strike."

8

58.    Meanwhile, other officers who reviewed the surveillance footage of the attack identified his use of force as a strike and understood that Deputy Gentempo should have reported the assault.

59.    For example, Sergeant Peeper stated, "I would say it was a strike . . . he struck something," and "yes," Deputy Gentempo should have reported the strike.

60.    At the close of her investigation, Investigator Iriart found that Deputy Gentempo had punched Mr. Finn in the face without justification and then lied about it.  Investigator Iriart provided her findings to the Conduct Review Unit, which memorialized them in a draft Review and Findings Report.

61.    In its original draft Review and Findings Report, the Conduct Review Unit determined that Deputy Gentempo had engaged in three separate policy violations: Inappropriate Force on a Person (RR-300.22) for his assault of Mr. Finn; Knowingly Making Misleading or Inaccurate Statements (RR-200.4.1) for lying in his written report following the assault; and Commission of a Deceptive Act (RR-200.4.2) for lying about his conduct during his interview with Investigator Iriart.[2]

62.    Based on these findings, the Conduct Review Unit recommended that Deputy Gentempo receive an eighteen-day suspension for his excessive use of force against Mr. Finn, a thirty-day suspension for lying in his official report, and termination for lying during his interview with Investigator Iriart. In its proposed Findings and Review, issued on February 19,

---

[2] These policy violations reference provisions in DSD's Rules and Regulations.

2020, the Conduct Review Unit described Deputy Gentempo's conduct with respect to Mr. Finn

as follows:

> "Deputy Gentempo responded by striking toward inmate Finn twice in the face
> area, while Inmate Finn appeared to block the strikes with the blanket he had in his
> possession, literally a split second later [] Deputy Gentempo took a bracing step
> onto his left leg, cocked his left arm back, and followed through with his left arm
> as his left foot left the ground;  then Deputy Gentempo immediately took a second
> swing at Inmate Finn's face area. . . .  Deputy Gentempo then pushed Inmate Finn
> by the head/neck area with his left hand, pushing him hard enough to cause the
> wheelchair to roll backward a few feet and fall backward to the ground."

63.     Deputy Gentempo's Contemplation of Discipline Hearing was held on April 20,

2020, and was conducted by then Interim Sheriff Fran Gomez, then Chief Elias Diggins,

Conduct Review Unit Director Gillian Fahlsing, Greg Crittenden and Nicholas Mitchell of the

Office of the Independent Monitor, Chief Deputy Executive Director of the Department of Safety

Mary Dulacki, and Denver Assistant City Attorney Jennifer Jacobsen.

64.     During that hearing, members of the Hearing Committee asked Deputy Gentempo

leading questions intended to justify his conduct and bolster his untruthful statements that he had

not struck Mr. Finn, despite the strikes being clearly depicted by video evidence.

65.     Three days later, on April 23, 2020, the DSD Conduct Review Unit issued its

Final Review and Findings in Deputy Gentempo's disciplinary case.

66.     The final Review and Findings Report issued by the Conduct Review was an

altered version of the original report that incorporated and memorialized Investigator Iriart's

factual findings.

67.     While the original draft findings presented to the Conduct Review Unit had

determined that Deputy Gentempo deputy violated three separate DSD policies over the course

of the case and recommended multiple suspensions and ultimately that Deputy Gentempo be

terminated, the final recommendations failed to sustain a single allegation against Deputy

Gentempo.

68.     The final Review and Findings of the Conduct Review Unit determined that "the

allegations against [Deputy Gentempo] regarding the asserted policy and procedural violations

are Not Sustained."

69.     The stated rationale for this determination was that "There [was] insufficient

evidence to either prove or disprove the allegation[s]."

70.     The final report significantly altered Investigator Iriart's investigatory findings.

71.     The final report omitted any reference to Deputy Gentempo striking Mr. Finn in

the face.

72.     The final report includes additional justifications for Deputy Gentempo's use of

force including assigning blame to Mr. Finn.

73.     The final report altered Investigator Iriart's finding that Deputy Gentempo had

lied in his report and interview.

74.     The DSD's final determination is incomprehensible—video evidence clearly

shows Deputy Gentempo repeatedly striking Mr. Finn in the face, flipping his wheelchair, then

applying painful pressure points to his face and neck, even though Mr. Finn was entirely

defenseless.

75.     The DSD's altered Review and Findings whitewashes and ratifies Deputy

Gentempo's misconduct.

76.    On May 5, 2020, Investigator Iriart looked at the investigative database and read the altered Review and Findings Report. Investigator Iriart recognized that the facts and analysis of the case had been drastically changed to exonerate Deputy Gentempo.

77.    Investigator Iriart emailed a copy of the original and final versions of the Review and Findings Reports to her fellow investigators. Several of those investigators sent Ms. Iriart email and text messages agreeing that the facts and analysis of the case should not have been changed to justify the decision not to sustain disciplinary charges against Deputy Gentempo.

78.    The original Findings and Review Report, which accurately described Deputy Gentempo's conduct, had been deleted and was no longer in Deputy Gentempo's file.

79.    On May 6, 2020, Greg Huff, another administrative investigator, texted Ms. Iriart to say he had read the different rationales in both original Review and Findings Report and the altered, final version and commented that they were polar opposites. Investigator Huff stated that the facts should be the facts and that he believed the process was flawed because to write one draft saying the force was completely unjustified and then another draft saying the force was reasonable demonstrated how broken DSD's disciplinary system was.

80.    Shortly after, Investigator Iriart attempted to publicize the DSD's unfounded decision to exonerate Deputy Gentempo, along with its more general practice of covering up the misconduct of its officers.

81.    On May 6, 2020, Investigator Iriart communicated with Conduct Review Unit analyst Rose Ceja, the analyst who wrote the original Findings and Review Report that incorporated and memorializes Investigator Iriart's findings and recommended that Deputy Gentempo be disciplined.  Ms. Ceja told Investigator Iriart that she had also written the altered,

final Findings and Review Report and had altered the factual findings and changed the disciplinary recommendations at the urging of then Interim Sheriff Fran Gomez and Chief Elias Diggins.

82.     The alterations to the facts and analysis were made to support Chief Elias Diggins' and Interim Sheriff Gomez's politically motivated decision not to impose discipline on Deputy Gentempo.

83.     Had discipline been imposed, the incident would have been included in a published list of disciplinary cases that would have caught the attention of the public and the media.  By clearing Deputy Gentempo of all wrongdoing, Denver was able to hide his misconduct from any public notice or scrutiny.

84.     On May 11, 2020, almost one month after the investigation into the wrongdoing committed by Deputy Gentempo had concluded, and Denver had issued its final findings exonerating him, Investigator Iriart sent a pseudonymous email to Fox 31 Reporter Rob Low and told him to request the video for IA case S2019-0076 (Deputy Gentempo's disciplinary case involving Mr. Finn).

85.     On May 18, 2020, Investigator Iriart communicated with Conduct Review Unit Analyst Melissa Elson.  Investigator Iriart asked Ms. Elson why her office was issuing disciplinary decisions that did not accurately reflect the misconduct committed by deputies in many instances.  Ms. Elson responded with words to the effect that DSD's top decisionmakers, alluding to Fran Gomez and Elias Diggins, often forced the Conduct Review Unit to change its findings.  Ms. Elson stated that this was customary within the department and that this concern had been raised repeatedly in meetings within the department.

13

86.    On June 3, 2020, Fox 31 aired a story about Deputy Gentempo's use of force against Mr. Finn and included a portion of the surveillance video documenting the incident.

87.    Around the same time, Investigator Iriart's supervisor confronted her with a copy of Fox 31's open records request for the video evidence in Deputy Gentempo's disciplinary case and later suspended her employment while initiating an investigation against her.

88.    Shortly thereafter, Investigator Iriart testified in front of the Colorado State Legislature about the corrupt disciplinary process at the DSD.

89.    The DSD terminated Investigator Iriart's employment in October 2020.

90.    The DSD's decision to silence the whistleblower responsible for the investigation of Deputy Gentempo makes clear that the DSD endorses and ratifies Deputy Gentempo's unjustified assault of Mr. Finn.

91.    DSD deputies, including Deputy Gentempo are well aware of Denver's custom, policy, and/or practice of exonerating officers despite clear investigative findings that they have engaged in misconduct.

92.    Denver's custom, policy, and/or practice of exonerating deputies who have engaged in misconduct encourages and in fact causes deputies to engage in misconduct, including excessive force.

93.    Deputy Gentempo was aware of Denver's custom, policy, and/or practice of exonerating deputies who have engaged in misconduct prior assaulting Mr. Finn.

94.    Deputy Gentempo would not have assaulted Mr. Finn and other inmates in the custody of the DSD were it not for Denver's custom, policy, and/or practice of exonerating deputies who have engaged in such misconduct.

14

95.     The events surrounding the alteration of the investigatory findings against Deputy Gentempo are but one example of a long history within the DSD of exonerating officers who commit misconduct at the will of DSD's top decision makers.

96.     Denver engages in a custom, policy and/or practice of altering the Conduct Review Unit's Review and Findings Reports to justify its disciplinary decisions in *post hoc* fashion.

97.     Denver engages in a custom, policy and/or practice of altering the Conduct Review Unit's Review and Findings Reports to justify its failure to impose discipline on deputies that have engaged in misconduct.

98.     Denver engages in a custom, policy and/or practice of altering the Conduct Review Unit's Review and Findings Report and then deleting the original drafts to cover up the fact that it doctored its investigators and the Conduct Review Unit's findings in order to justify its failure to impose discipline on deputies that have engaged in misconduct.

99.     Denver engages in its custom, policy and/or practice of deleting the original drafts of its investigators and the Conduct Review Unit's Review Findings and Report so that the original draft cannot be obtained through open records requests and compared to subsequent, altered reports and exonerative disciplinary decisions.

100.    Denver engages in a custom, policy and/or practice of forcing its administrative investigators to sign confidentiality agreements intended to prevent its investigators from providing the public with any information about the disciplinary cases they investigate.  Denver engages in this policy and/or practice with the intent of preventing the public from learning that it fails to discipline deputies that have engaged in misconduct.

101.    Administrative Investigator Iriart was presented with and signed Denver's confidentiality agreement prior to beginning her work for Denver.

102.    During his tenure as Sheriff, Elias Diggins has personally participated in the alteration of the Conduct Review Unit's investigatory findings to justify Denver's failure to impose discipline on deputies that have committed misconduct.

103.    During her tenure as Interim Sheriff, Fran Gomez has personally participated in the alteration of the Conduct Review Unit's investigatory findings to justify Denver's failure to impose discipline on deputies that have committed misconduct.

104.    During her tenure as Chief Deputy Executive Director, Mary Dulacki has personally participated in the alteration of the Conduct Review Unit's investigatory findings to justify Denver's failure to impose discipline on deputies that have committed misconduct.

105.    Elias Diggins, Fran Gomez, and Mary Dulacki were official policymakers for Denver at all times relevant to the events alleged herein.

### The DSD's Failure to Train, Supervise, or Discipline Deputy Gentempo

106.    In addition to ratifying Deputy Gentempo's misconduct, the DSD also failed to train, supervise, and discipline Deputy Gentempo prior to his assault of Mr. Finn.

107.    Deputy Gentempo admitted during the IAB investigation that he had not been trained on the use of force in situations involving arrestees that allegedly attempt to spit at or near officers.

108.    In Deputy Gentempo's own words: "I'm not trying to justify anything.  All I'm trying to say is there was no layout, there's nothing in our policy that will tell you what exactly to do when you're being spit on."

16

109.    Even if such training existed, Deputy Gentempo admitted he had not reviewed or signed 1,631 policy documents contained in DSD's employee training database.

110.    Separately, the beating of Mr. Finn was not the first time that the DSD failed to discipline Deputy Gentempo.

111.    In September 2017, a jail inmate accused Deputy Gentempo of using inappropriate force to restrain him during an incident in the jail.

112.    In October 2017, another inmate accused Deputy Gentempo of physically assaulting him following an altercation with another inmate.

113.    In June 2018, another inmate accused Deputy Gentempo of kicking him to the ground while he was being transferred from Denver Health to the DDC.

114.    And in May 2020, yet another inmate accused Deputy Gentempo of pushing him to the floor in his cell—that inmate was then transferred to Denver Health, bleeding from his face.

115.    The DSD did not discipline Deputy Gentempo for any of these acts.

### *The DSD's Widespread Practice of Employing Excessive Force and Failing to Discipline its Officers*

116.    The DSD has a custom of using excessive force against its constituents and frequently failing to discipline its officers for such.

117.    In or around 2020, DSD Deputy Kevin Bagley punched an inmate several times in the head, even while the inmate was on the ground.  As in this case, punching defenseless inmates in the head constitutes the use of excessive force.

118.    In or around November 2021, a DSD Deputy used excessive force against an inmate who refused to remove his hair tie.  No force was necessary during that non-violent interaction.

119.    In or around 2020, DSD Deputy Ian Schiffhauer grabbed an arrestee's neck and continued to apply pressure to the man's neck after taking him to the ground.  As in this case, continuing to attack defenseless inmates constitutes the use of excessive force.

120.    In or around 2020, DSD Sergeant James Casias shoved an inmate to the ground. A sergeant employing excessive force sends a clear message from the top to the remaining DSD officers of what conduct is tolerable.

121.    In or around 2020, DSD Deputy Denise Valdez stood on an inmate's legs without reasonable justification and received no discipline.  Standing on an inmate's legs is neither necessary nor DSD-approved.

122.    In or around 2012, DSD Deputy Brady Lovingier slammed a pre-trial detainee's head into a courtroom wall.

123.    Throughout his employment, at least five inmates have accused Deputy Gentempo of using excessive force; however, Deputy Gentempo has never been disciplined for any of these transgressions.

124.    In addition, DSD has a widespread and longstanding policy and practice of altering IAB findings in order to exonerate deputies who IAB determined had violated DSD policy and to prevent the public from learning about DSD employee misconduct.

125.    Investigator Iriart was aware of this policy and practice and in at least one instance voiced her complaints about this process to the public.  Investigator Iriart also

complained to her DSD superiors about this policy and practice. However, DSD took no meaningful action to remedy her complaints.

***A Summation of Denver's Customs, Policies, and Practices That Were the Moving Forces Behind Deputy Gentempo's Constitutional Violations Against Mr. Finn***

126. Denver's customs, policies, and practices were the moving forces behind Deputy Gentempo's use of excessive force against Mr. Finn.

127. Denver carried out these customs, policies, and practices with deliberate indifference, making the constitutional violation against Mr. Finn predictable and almost inevitable.

128. Such customs, policies, and practices include the ratification of Deputy Gentempo's beating of Mr. Finn; the failure to train or supervise Deputy Gentempo with respect to the use of force against allegedly spitting arrestees; the failure to discipline Deputy Gentempo with respect to previous accusations of excessive force; and the widespread practice of its officers employing excessive force and frequently receiving no disciplinary actions. These customs, policies, and practices are detailed in the preceding paragraphs and summarized below.

129. Denver ratified Deputy Gentempo's constitutional violation by rejecting the IAB's recommendation of disciplinary action. Instead, Denver exonerated Deputy Gentempo and went on to silence a whistleblower who flagged the failure to discipline Deputy Gentempo as part of a much wider practice of exonerating officers who committed misconduct.

130. Denver failed to train or supervise Deputy Gentempo since, as he admits, he received no training on the use of force against allegedly spitting arrestees.

131. Denver failed to discipline Deputy Gentempo for several other accusations of excessive force leading up to the beating of Mr. Finn.

19

132.    Denver has a custom of employing excessive force and frequently failing to discipline its officers that constitutes a widespread practice, as evidenced by the numerous incidents identified above involving DSD officers other than Deputy Gentempo, Deputy Gentempo's own disciplinary history, and Investigator Iriart's chief complaint.

133.    These customs, policies, and practices were consciously permitted, authorized, or executed by Denver. They reflect an intentional decision to choose from among various alternative courses of action.

134.    They were also the cause of the constitutional violation alleged herein. Deputy Gentempo had not been trained for the situation at issue, had not received discipline in the past for similar misconduct, and knew that even if he employed excessive force against Mr. Finn, it likely would be tolerated by DSD. Thus, it was entirely foreseeable that Deputy Gentempo would continue to use excessive force against inmates and arrestees, including Mr. Finn.

135.    The actions were approved, condoned, and ratified by Denver, deprived Mr. Finn of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and resulted in substantial injuries recoverable by the Estate of Mr. Finn.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment Excessive Force
### (Against Deputy Gentempo)

136.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if set forth herein.

137.    Defendant Deputy Gentempo, at all times relevant hereto, was acting under color of state law in his capacity as a law enforcement officer.

20

138.    At the time of his arrest, Mr. Finn had a clearly established right under the Fourth Amendment to the United States Constitution to be secure in his person against unreasonable searches and seizures, including through the use of excessive force in carrying out a seizure of his person.

139.    Defendant Deputy Gentempo's repeated strikes to Mr. Finn's face, his shove of Mr. Finn to the ground, his application of painful pressure points to Mr. Finn's head and neck, and his gratuitous bump of Mr. Finn's head into a parking bollard were objectively unreasonable under the circumstances.

140.    Such misconduct was particularly unreasonable given that, at all relevant times, Mr. Finn was handcuffed, shackled, and restrained in a wheelchair.  He was completely defenseless and posed no physical threat to the officers.

141.    Defendant Deputy Gentempo's conduct violated clearly established rights belonging to Mr. Finn of which any reasonable law enforcement officer knew or should have known.

142.    Defendant Deputy Gentempo's actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Mr. Finn's federally protected rights, and he engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Finn's constitutionally protected rights.

143.    Evidence of such malice, recklessness, and callous indifference includes the violent nature of the assault itself, along with Deputy Gentempo's deception and complete lack of remorse during the ensuing investigation.

144.    The unlawful acts herein described were carried out pursuant to the customs, policies, and practices of Defendant Denver.

145.    Defendant Denver carried out these customs, policies, and practices with deliberate indifference, making the constitutional violation against Mr. Finn predictable and almost inevitable.

146.    Such customs, policies, and practices include the ratification of Deputy Gentempo's beating of Mr. Finn; the failure to train or supervise Deputy Gentempo with respect to the use of force against allegedly spitting arrestees; the failure to discipline Deputy Gentempo with respect to previous accusations of excessive force; and the widespread practice of excessive force and frequent sham disciplinary processes related to such.

147.    The acts or omissions of each Defendant, including the unconstitutional customs, policies, and practices described herein, were a legal and proximate cause of Plaintiff's damages.

148.    Because Defendant Denver's customs, policies, and practices were the moving forces behind Deputy Gentempo's constitutional violations, his misconduct is chargeable to the municipality.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Ratification, Failure to Train or Supervise, Failure to Discipline, and Widespread Unlawful Practices
### (Against Defendant Denver)

149.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if set forth herein.

150.    Defendant Denver ratified the unlawful use of excessive force alleged herein, failed to train and supervise Defendant Deputy Gentempo, failed to discipline him for similar

22

misconduct prior to the unlawful conduct alleged herein, and perpetuated a widespread practice of excessive force and frequent cover-ups.

151.    These customs, policies, and practices were the driving forces and proximate causes of Defendant Deputy Gentempo's constitutional violations against Mr. Finn.

152.    Defendant Denver was deliberately indifferent to the constitutional rights of Mr. Finn, knowing that its customs, policies, and practices would inevitably result in the excessive force employed by Defendant Deputy Gentempo.

153.    The acts or omissions of Defendant Denver caused Mr. Finn to suffer extreme physical and mental pain during the assault.

154.    The acts or omissions of Defendant Denver were a legal and proximate cause of Plaintiff's damages.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in its favor, and against each Defendant, for the following relief:

a.    All declaratory relief and injunctive relief, as appropriate;

b.    Actual economic damages as established at trial;

c.    Compensatory damages, including but not limited to those for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, medical bills, and other non-pecuniary losses;

d.    Nominal damages;

e.    Punitive damages for all claims as allowed by law in an amount to be determined at trial;

f.      Pre-judgment and post-judgment interest at the highest lawful rate;

g.      The maximum tax-offset permitted by law;

h.      Attorneys' fees and costs; and

i.      Such further relief as justice requires, and any other relief as allowed by law.

## VII.    JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

DATED this 9th date of December 2021.

RATHOD | MOHAMEDBHAI LLC

*s/ Nicholas A. Lutz*
Nicholas Lutz
Matthew Cron
Omeed Azmoudeh
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400
nl@rmlawyers.com
mc@rmlawyers.com
oa@rmlawyers.com

THE LAW OFFICE OF BENJAMIN HARTFORD

*s/ Benjamin Hartford*
Benjamin Hartford
650 S. Cherry Street, Suite 1225
Glendale, Colorado 80246
(303) 991-5757
ben@bhartfordlaw.com