IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02160-CNS-SKC

ESTATE OF SERAFIN FINN, by and through its personal representative Melissa R. Schwartz,
    Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality,
DEPUTY JASON GENTEMPO, in his individual capacity,
    Defendants.

---

**DENVER'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

Defendant, the City and County of Denver ("Denver") files this Reply in Support of Summary Judgment ("Reply") as follows:[1]

### I.    REPLY CONCERNING UNDISPUTED FACTS ("RCUF")[2]

Many paragraphs in Plaintiff's RDSUMF contain impermissible legal argument. [CNS Civ. Practice Standard III(E)(2)h]; *Palacios v. Fortuna*, 61 F.4th 1248, 1262 (10th Cir. 2023) (undisputed facts "exclude[] characterizations of facts and legal arguments"). In most cases, Plaintiff argues her point just after her admission or denial, starting with the word "however." *See* RDSUMF at ¶¶ 3-9; 11; 13; 17; 34-35; 37-38; 39-46 (grouped). And in many instances, the material that follows is a non-sequitur that merely repeats her theory of the case or characterizations of the same, rather than a factual response to the facts offered by Denver. *See id.*

---

[1] Denver timely filed its motion for summary judgment on June 12, 2023 (Doc. 87) and Plaintiff timely filed her Response in Opposition ("Response") on July 17, 2023 (Doc. 95).

[2] To the extent any facts or arguments are not addressed herein, Denver takes the position the Court can evaluate them on the basis of the Motion for Summary Judgment alone.

The Court should not consider this material in resolving Denver's motion.

Plaintiff admits nearly all facts in the SUMF, but denies (in full or in part) the following:

3. Plaintiff's response – which straddles the line between argument and fact – ignores Denver's proffered evidence. While Plaintiff relies nearly entirely on Gentempo's statements to show an absence of training, she *excludes* his testimony that he was trained "how to use it." Ex. C at [25:10-18] (referring to spit hood). And while stating he could recall no formal training on spit hoods, Gentempo testified he was trained in the Use of Restraints policy, which contains the DSD spit sock guidance and procedures. *Id.* at [25:10-18] and [167:1-25]. Plaintiff also does not mention Gentempo's clear and accurate understanding – based on policy and his training – that *any* force applied must be the "least amount" necessary. *Id.* at [186:8 – 187:22].

Next, Plaintiff's sole reference to Siwakoti's testimony to support her characterization that "DSD administers no training whatsoever on when spit hoods should be employed, or why they should be implemented" is misleading, because it fails to include the rest of the discussion where Siwakoti clearly states he *had* received prior training on the protective hood, both through training on the Use of Restraints policy and his FTO training. Ex. D at [107:14 – 108:17] and [109:7-10].[3]

14. Plaintiff's denial here should not be credited, as it is a non-sequitur and appears to rest on a challenge to facts not even offered by Denver in this paragraph. While Denver points to testimony that both Siwakoti and Gentempo were trained on D.O. 1.00.3014 – without reference to the spit hood provisions therein – Plaintiff rejects this by pivoting to spit hoods exclusively, and incorporating all testimony she introduced in prior paragraphs. But Plaintiff has not rebut this fact. Whatever Gentempo's memory of spit hood training, the referenced testimony shows both deputies

---

[3] All this testimony is referred to in paragraph 15 of Denver's SUMF.

2

were trained in and recognized the Use of Restraints policy, at least as a general matter. Separately, to the extent offered as a general proposition, Plaintiff's claim that record "evidence does not clearly establish that deputies receive pre-or in-service training on spit hoods . . ." is rebutted by the testimony of both Siwakoti and Gentempo that they *had* received certain spit hood training. *See* Den. SUMF at ¶ 15; *see also supra* (Resp. to Pl. RDSUMF, ¶ 3) and *infra* Section IV(C).

15. Plaintiff's denial here should not be credited as it again fails to rebut the facts set forth by Denver. While Siwakoti clearly testified he *had* received spit hood training in his DPD tenure (and had applied a spit hood in a live situation before this incident), Plaintiff attempts to rebut this fact by concluding Siwakoti received no "*formal*" spit-hood training, further qualified by the mere statement Siwakoti had not "*practiced with* a protective hood." But the absence of such "practice" simply indicates Siwakoti had not done *scenario-based training* on spit hoods, not that he was unaware of their purpose or unequipped to use them. Ex. D at [107:14 – 108:17] and [109:7-10]. And while *Gentempo* does not recall "formal" spit hood training, Plaintiff again ignores his clear testimony he was trained "how to use it." Ex. C, at [25:10-18]. Further, while Billings stated the DSD in-service curriculum contains "very limited" spit hood training, he also made clear it *does* reference application of the hood, separate and aside from FTO training. Ex. E, at [72:18 – 74:3].[4]

## II. <u>RESPONSE CONCERNING DISPUTED FACTS ("RCDF")</u>

1. Admitted.

2. Denied. This constitutes legal argument that is impermissible in the statement of

---

[4] Billings' testimony referenced DSD's in-service training, as Billings noted he could not speak to the DSD FTO (post-academy) training program, and what that entailed regarding spit hoods etc. Ex. E at [73:3-11]. Siwakoti, however, clarified that in his experience, the FTO training program *does* include spit-hood training. Ex. D at [109:7-10] (Den. SUMF at ¶ 15).

3

facts. As to the content therein, it is admitted that DSD deputies observe inmates spitting from time to time. However, the record shows it is infrequent that an inmate actually spits at or on a correctional officer or employee. Den. SUMF at ¶¶ 39-46.

3. Admitted, subject to the qualification that this statement lacks contextual facts including when, where, or how the incident happened. And such facts are critical here because the record statement on which Plaintiff relies indicates this incident happened *23 years* before the hearing in question, and is thus not relevant to any disputed issue here. Pl. Ex. 5.

4. Admitted in part, denied in part. It is admitted the quote accurately reflects the referenced testimony and that Billings agreed DSD could implement more training on spitting, but Plaintiff's characterization of the statement (i.e. "so that future deputies will not respond with the inappropriate force that Deputy Gentempo dispensed to Mr. Finn") amounts to argument and/or an impermissible legal conclusion. This characterization is also belied by the plain language of the testimony, as well as Billings' other testimony regarding the same, in which he declined the invitations of counsel to conclude Gentempo's force was "inappropriate" or resulted from improper training. Billings also testified at length with approval about the importance of de-escalation, which the deputies attempted to do here. Den. Ex. E at [34:9 – 39:8] and [87:1-22]; Den. Ex. F; *see also* SUMF at ¶¶ 19-32.

III. **ARGUMENT**

A. **Plaintiff Offers no Expert Testimony to Support her Claim**

Courts have generally required expert testimony to establish single-incident liability in the training context. *See Brown v. Gray*, 227 F.3d 1278, 1287 n.3 (10th Cir. 2000) (interpreting *Okla. City v. Tuttle*, 471 U.S. 808 (1985) to require expert testimony where a *Monell* claim for inadequate

training is based on a single incident: "[T]he Supreme Court never found expert testimony insufficient in this context; to the contrary it *required* such additional evidence for a jury to find municipal liability for a single incident of excessive force."); *Nelson v. Wichita*, 217 F. Supp. 2d 1179, 1186 (D. Kan. 2002); *see also Kraus v. Ferrari*, No. 08-cv-2808-WDM-BNB, 2010 WL 3430839, at *9 (D. Colo. Aug. 30, 2010) (rejecting failure-to-train claim for same reasons).

Here, despite demanding consideration of a spit hood, Plaintiff offers no expert testimony as to the propriety – let alone desirability – of a spit hood, in this situation or any similar one. Especially given the obvious challenges and concerns attendant to placing a bag over a person's head against their will, this claim should not be permitted to proceed absent such testimony.

### B. Plaintiff Does Not Substantively Address Denver's Causation Arguments

Causation is a necessary element of any *Monell* claim. In its motion for summary judgment, Denver argued that even if Plaintiff could create a fact issue with respect to the adequacy of Denver's training concerning spitting inmates, no such inadequacy caused Finn's harms here due to his unique and particular circumstances, which would have acted to prevent a spit hood as the first course of action in any case. Doc. 87 at 18-20. But instead of contesting this argument, Plaintiff acknowledges her causation problem: ". . . Gentempo could have . . . used a control technique while another officer applied a spit sock. With better training, perhaps [] Gentempo would have realized that control techniques and a spit sock were actually *inappropriate* for those particular circumstances given, say, Mr. Finn's *medical condition*. [] Maybe then he would have chosen a *different,* constitutionally appropriate response*."* Doc. 95 at 13 (emphasis added).

Having now acknowledged that in this case, a spit hood might in fact have been "*inappropriate*" in light of Finn's particular condition, Plaintiff cannot continue to attribute Finn's

5

alleged harms to any absence of spit hood training. Plaintiff's own uncertainty as to the appropriate response in this case, and her acknowledgment that Finn's particular situation might preclude the use of a spit hood compels summary judgment for Denver on this element.[5]

### C. Plaintiff's Response Does Not Identify an Actionable Training Deficiency

1. <u>Spit hood training is not required, but even if it were, DSD provided adequate spit hood training during the relevant times</u>

The only specific training deficiency ever identified by Plaintiff relates to the use of a spit hood. Doc. 77.[6] But Plaintiff's Response does not create a fact issue on this point. First, Plaintiff does not cite – and Denver is not aware of – a single case finding a city may be liable for not training on spit hoods, let alone not mandating their application in any situation. Nor does Plaintiff mention the cases cited in Denver's motion for summary judgment which specifically address – and reject – failure-to-train theories based on the absence of spit hood training. Doc. 87 at 17-18 (citing *Marden v. Cnty. of Midland*, No. 15-CV-14504, 2017 WL 1104960, at *11 (E.D. Mich. Mar. 24, 2017); *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1137 (E.D. Cal. 2016); *see also Est. of Burnett v. City of Colo. Springs*, 616 F. Supp. 3d 1111, 1119–20 (D. Colo. 2022)). As this case law shows, there is no constitutional requirement that spit hoods be available at any time (let alone all times), or that training on the same be provided.

But even if this requirement existed, the record clearly indicates DSD *did* provide spit hood

---

[5] Plaintiff now appears to suggest instead that because Gentempo was *not aware* of Finn's particular condition, causation is still present. Pl. RDSUMF ¶¶ 47-48. But this misapplies the standard, which merely asks if the plaintiff's harms were in fact caused by the precise deficiency alleged. Further, there is no record basis to find Gentempo did *not* suspect any intoxication.

[6] Although Plaintiff's response contends the absence of adequate spit hood training is only "part" of DSD's training deficiencies, Plaintiff – relying on no expert – points to no others.

6

training to deputies during the relevant times. SUMF at ¶¶ 15; 37. Crucially, Gentempo testified he was trained "how to use it." Siwakoti testified similarly, explaining he was trained on both the policy relating to protective hoods *and* their application during his FTO program, further noting "sergeant still uses it." And Billings confirmed this, noting that in-service training – albeit limited – was provided to deputies concerning how to apply the hood. *See* SUMF at ¶ 15. Further, Plaintiff acknowledges that "application of a spit hood is straightforward, and simply entails sliding a nylon style hood over a person's head." SUMF at 16. Accordingly, even if this Court were inclined to require the provision of spit hoods or related training, Denver's training was legally sufficient.

2. Plaintiff has not identified a training deficiency unrelated to spit hoods

Plaintiff likewise cannot proceed on any *other* training deficiency. Plaintiff has never identified such a deficiency, nor showed how Denver's existing training programs are inadequate to address – among other types of active aggression – spitting situations. As argued in Denver's motion, DSD employs comprehensive use-of-force and de-escalation training which includes real-time responses to simulated active aggression situations. DSD also carves out "active aggression" from those that may be less dangerous, and requires corresponding responses for each, in accordance with the level of threat. And in all cases, DSD expressly requires – through policy *and* training – that *any* application of force must be (a) the *least amount of force* required to achieve the objective; and (b) reasonable and necessary under the circumstances. SUMF at ¶¶ 4-9; 15; 18; 25; 31. Gentempo and Siwakoti were each trained on, and understood, these requirements. *Id.*

While Denver argues this substantial training is constitutionally sufficient to address the full panoply of inmate aggression, including spitting, Plaintiff again does not cite any case finding a training scheme insufficient or improper for the absence of spitting-specific training. Even if one

7

existed, however, the record here does not support a finding of inadequacy – let alone deliberate indifference – when comprehensive and adequate responsive tools are spelled out in Denver's de-escalation and related use-of-force scenario training. SUMF at ¶¶ 2-38. Given the absence of precedent, and considering DSD's robust training scheme, the Court should reject Plaintiff's unsupported suggestion that the law requires anything more.

### D. This case is Distinguishable from *Valdez*[7]

Plaintiff argues the decision in *Valdez v. Macdonald*, involving a single-incident training claim in the police shooting context, compels this Court to also reject Denver's arguments here. Doc. 95 (citing 66 F. 4th 796, 818 (10th Cir. 2023)). But *Valdez* is readily distinguishable. First, *Valdez* involved a police firearm discharge (in response to a suspect firearm discharge), which in every instance entails potential life-or-death consequences. When a suspect fires a gun at an officer, the *only* effective force – if any responsive force is used – is likely a return of fire, and with it the corresponding possibility of death or serious injury. Inmate spitting situations – while disturbing and sometimes dangerous – do not pose the same level of threat to the officer, or to the spitting inmate by virtue of the most likely response. Further, any "wrong choice" made by a spit-upon officer is not akin to a "wrong choice" when shooting a gun, with respect to the likelihood of any civil rights violation. *Valdez,* 66 F. 4th at 830. In a shooting, the discharging officer must likely choose between only two possibilities with opposite consequences – shoot or don't shoot. But in responding to a spitting inmate, there could be any number of permissible responses, all based on the circumstances. In the jail setting, the difference among available responses (i.e. OPNs

---

[7] While both cases were against Denver, *Valdez* involved DPD and the instant case involves DSD, wholly separate entities within the city. *Valdez* involved an underlying claim asserted under the Fourth Amendment while the instant case implicates the Fourteenth Amendment.

vs. closed-hand strikes vs. certain control holds) to acts of aggression or violence does not vary so greatly as, i.e. the difference between firing and not firing a gun. As such, DSD policy does not demand any single type of response for "active aggression," but rather requires deputies to assess the situation, and then use the "least amount of force required to achieve the objective." Plaintiff does not challenge this policy, but merely repeats the argument that the relative lack of spitting-specific training renders it deficient. But liability for failing to carve out a separate response to each type of possibly offending action – including spitting – is not contemplated by *Valdez*.

Relatedly, while *Valdez* involved an untaught prohibition, Plaintiff here acknowledges the constitutionally appropriate response with respect to Finn was likely within DSD's existing training programs:

> With constitutionally adequate training, [] Gentempo could have, as Sergeant Billings opined, used a control technique while another officer applied a spit sock. . . With better training, perhaps [] Gentempo would have realized that control techniques and a spit sock were actually inappropriate for those particular circumstances given, say, Mr. Finn's medical condition. [] Maybe then he would have chosen a different, constitutionally appropriate response. Doc. 95 at 12-13.[8]

Having proffered no evidence or expert opinion as to any alternative training program, Plaintiff appears to complain *not* that Gentempo lacked proper tools to handle the situation, but rather didn't know which *existing* tools and/or knowledge he should draw upon when spit on. This distinction further precludes a finding of deliberate indifference under *Valdez,* which involved the failure to expressly prohibit the very specific conduct of "shooting out of anger" and thus fell

---

[8] This suggestion, unsupported by any expert, is implausible, as it would have required three officers when only two were present (in light of Siwakoti's unchallenged testimony that he had to keep hold of the chair). Further, in Plaintiff's proposed course of action, Finn would have quickly wound up with a nylon bag forcefully placed over his head, against his will. As a practical matter, this cannot be said to be *such* a better or more desirable outcome for Finn that the failure to *require* it could amount – in this single incident – to deliberate indifference.

outside the existing training scheme.

### E. The Fact that DSD's Training Programs Could be Improved does not amount to Deliberate Indifference.

In her Response, Plaintiff relies on Sergeant Billings' testimony opining on the desirability of more training, including his opinion that additional scenario-based training would be beneficial. Doc. 95 at 9; 13. While Plaintiff characterizes these statements as an admission "that DSD needs to improve training on spitting inmates so that future deputies will not respond with the inappropriate force that [] Gentempo dispensed to Mr. Finn," (Pl. SADF at ¶ 4), this does not reflect the testimony. Instead, Billings – designated to testify on DSD training, *not* the propriety of force used – rejected this notion. Def. Ex. E at [34:9 – 39:8]. Further, Billings explained that in DSD's existing training, the goal in *any* use-of-force scenario – communicated to deputies through the classroom and live scenarios – is "always to try to deescalate." *Id.* at [87:1-22].

Billings' statements about ways DSD could improve moving forward are insufficient to show any training deficiency, let alone deliberate indifference. "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Hinman v. Joyce,* 201 F. Supp. 3d 1283, 1298 (D. Colo. 2016) (quoting *Canton*, 498 U.S. at 390–91); *see also Brown v. Whitman*, 651 F.Supp.2d 1216, 1231 (D. Colo. 2009). Accordingly, Plaintiff's argument should be rejected.

**WHEREFORE**, for the reasons herein and those argued in Denver's Motion for Summary Judgment, Denver respectfully requests this Court dismiss all of Plaintiff's claims against it.

Dated this 7th day of August, 2023.

                Respectfully submitted,

                *s/ Jonathan Cooper*
                Jonathan Cooper
                Assistant City Attorney
                Denver City Attorney's Office
                201 West Colfax Ave., Dept. 1108
                Denver, Colorado 80202.
                Telephone: (720) 913-3100
                Facsimile: (720) 913-3190
                Email: jonathan.cooper@denvergov.org
                *Attorney for Defendant Denver*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 7th day of August, 2023, I electronically filed a true and correct copy of the above and foregoing **DENVER'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Matthew Cron
Omeed Azmoudeh
mc@rmlawyers.com
oa@rmlawyers.com
*Counsel for Plaintiff*

Benjamin Hartford
ben@bhartfordlaw.com
*Counsel for Plaintiff*

Eric M. Ziporin
Tiffany Toomey
SGR, LLC
eziporin@sgrllc.com
ttoomey@sgrllc.com
*Counsel for Defendant Jason Gentempo*

                                                  *s/ Jonathan Cooper*
                                                  Denver City Attorney's Office