IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 21-cv-02160-CNS-SKC

ESTATE OF SERAFIN FINN, by and through its personal representative Melissa R. Schwartz,

　　Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality and
DEPUTY JASON GENTEMPO, in his individual capacity,

　　Defendants.

---

**ORDER**

---

This matter comes before the Court on Defendant's Motion for Summary Judgment (ECF No. 85). For the following reasons, the Motion is DENIED.

### I. STATEMENT OF MATERIAL FACTS[1]

This civil action arises from Deputy Jason Gentempo's alleged violation of Serafin Finn's[2] constitutional right to be free from excessive force, resulting in injury. On March 19, 2019, Mr. Finn was arrested and transported to Denver Detention Center ("DDC") (ECF No. 85-1). Mr. Finn had multiple seizures upon his arrival at DDC, prompting his transport to the Denver Health Medical Center ("DHMC") around 11:00 p.m. (ECF No. 85-2 at 2; ECF No. 85-3).

---

[1] The following factual recitation is drawn from Deputy Gentempo's motion (ECF No. 85), the Estate's response (ECF No. 93), and the exhibits, affidavits, and deposition transcripts attendant with each. To the extent the parties disagree over the historical facts surrounding Deputy Gentempo's use of force against Mr. Finn, the Court sets forth the relevant factual dispute for clarity. However, for purposes of the summary judgment analysis below, the Court construes these facts in the light most favorable to the Estate. *See Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).

[2] As noted below, Mr. Finn passed away due to causes unrelated to the alleged excessive force incident giving rise to this case. As such, the plaintiff in this matter is the Estate of Serafin Finn ("the Estate").

Around 2:30 a.m. the next morning, Deputy Gentempo and another deputy were dispatched to DHMC to transport Mr. Finn back to DDC (ECF No. 85-4 at 49:2–20; ECF No. 85-5 at 44:8–14; ECF No. 85-7, ¶ 2). Upon arrival at DHMC's Emergency Department, the deputies could hear Mr. Finn yelling and cursing at nursing staff and paramedics who were in or near his hospital room (ECF No. 85-4 at 49:25–50:4; ECF No. 85-5 at 44:15–20; ECF No. 85-7, ¶ 3). When the deputies entered the room to escort him to the van outside, Mr. Finn was handcuffed to a gurney and wearing leg irons (ECF No. 85-4 at 50:8–13). The deputies left Mr. Finn's leg irons in place, but they removed the handcuffs from the gurney and handcuffed Mr. Finn's hands in front of him (ECF No. 85-4 at 50:15–20; ECF No. 85-5 at 51:22–52:16; ECF No. 85-7, ¶ 3). Mr. Finn was then placed in a wheelchair with a blanket (ECF No. 85-5 at 53:2–54:2). During this time, Mr. Finn continued to yell and insult the nurses and deputies, including with racial slurs (ECF No. 85-4 at 126:17–23; ECF No. 85-5 at 49:19–24; ECF No. 87-7, ¶ 4).

The deputies wheeled Mr. Finn outside, down a ramp, and into DHMC's ambulance bay where their van was parked; Deputy Gentempo walked on the left side of the wheelchair while the other deputy pushed it (ECF No. 85-5 at 54:3–10, 112:2–18; ECF No. 85-7, ¶¶ 7, 8; Def's Ex. I, 00:00:14; Pl's Ex. 4, 00:00:00–00:00:26). At the bottom of the ramp, Deputy Gentempo heard Mr. Finn clear his throat to gather saliva to spit, and Mr. Finn spit for the first time on the ground (ECF No. 85-5 at 55:12–14; ECF No. 85-7, ¶ 8). Deputy Gentempo asked Mr. Finn not to start spitting (ECF No. 85-4 at 60:25–61:2; ECF No. 85-5 at 55:14–16; ECF No. 85-7, ¶ 9). In response, Mr. Finn turned his head toward Deputy Gentempo and stated, "Fuck you. You are all fucking liars" (ECF No. 85-5 at 55:20–21; ECF No. 85-7, ¶ 9). Mr. Finn then gathered saliva in his mouth and spit a second time at Deputy Gentempo, hitting him in his face, mouth, and chin area (ECF No. 85-5 at 55:21–23; ECF No. 85-7, ¶ 9; Def's Ex. I, 00:00:16).

At this point, the parties' accounts of the incident—and their interpretations of what the DHMC surveillance footage[3] captures—diverge sharply. Deputy Gentempo asserts that in response to being spit on, he attempted to close the distance between himself and Mr. Finn to prevent Mr. Finn from spitting again (ECF No. 85-5 at 60:19–21; ECF No. 85-7, ¶¶ 10, 22). As Deputy Gentempo moved toward Mr. Finn, he spit a third time, this time hitting Deputy Gentempo on his face and inside his mouth (ECF No. 85-5 at 57:5–11; ECF No. 85-7, ¶ 10). Using his left hand, Deputy Gentempo then either struck Mr. Finn, attempted to strike Mr. Finn, or covered Mr. Finn's face with the blanket to stop him from spitting (ECF No. 85-5 at 95:6–17; ECF No. 85-7, ¶ 11; Def's Ex. I, 00:00:18). Deputy Gentempo then immediately moved toward Mr. Finn with an open-palm, two-handed gesture, covering Mr. Finn's face with either his hands or the blanket to prevent him from spitting again (ECF No. 85-5 at 91:13–17; ECF No. 85-7, ¶ 14; Def's Ex. I, 00:00:18). As Deputy Gentempo attempted to cover Mr. Finn's face, the other deputy struggled to maintain control of the wheelchair, and it tipped over backwards unintentionally, sending Mr. Finn and Deputy Gentempo to the ground (ECF No. 85-4 at 86:18–20; ECF No. 85-5 at 116:21–24; ECF No. 85-7, ¶ 15; Def's Ex. I, 00:00:18–00:00:23). On the ground, Mr. Finn persisted in his attempts to spit at Deputy Gentempo (ECF No. 85-4 at 85:14–18; (ECF No. 85-5 at 116:21–117:12; ECF No. 85-7, ¶ 16).

In stark contrast, the Estate asserts that in response to being spit on, Deputy Gentempo immediately took a wide stance and punched Mr. Finn in the face using a closed left fist (Pl's Ex. 4, 00:00:31–00:00:37; Def's Ex. I, 00:00:08–00:00:20). Deputy Gentempo punched Mr. Finn with so much speed and momentum that when he swung his fist, his left leg came off the pavement

---

[3] Both parties have conventionally filed copies of DHMC's surveillance footage from different vantage points. Because the individual video clips are not marked with "ECF" docket numbers, the Court instead identifies each clip using the labels employed in the parties' briefing.

(Def's Ex. I, 00:00:08–00:00:20), and the impact of the punch forced Mr. Finn's head to the right (Pl's Ex. 4, 00:00:31–00:00:37). After this first punch, Mr. Finn raised both hands in pain and covered his own face with the blanket, thus preventing Mr. Finn from spitting on Deputy Gentempo again (Def's Ex. I, 00:00:08–00:00:20). Deputy Gentempo then punched Mr. Finn in the face a second time (*see id.*), followed shortly thereafter by making the "open-palm, two handed gesture" described above toward Mr. Finn's face (*id.*, 00:00:19–00:00:22). Mere seconds later, Deputy Gentempo intentionally flipped the wheelchair backward, slamming Mr. Finn to the ground (*id.*, 00:00:21–00:00:23; Pl's Ex. 4, 00:00:38–00:00:40). Deputy Gentempo went to the ground as well (*see id.*).

Here, the parties' accounts of the incident largely reconverge. While Deputy Gentempo and Mr. Finn were on the ground, Deputy Gentempo applied a mandibular angle pressure point hold[4] in an effort to hold Mr. Finn's head away and prevent further spitting until a spit hood could be retrieved and applied (ECF No. 85-5 at 67:6–17; ECF No. 85-7, ¶ 16). Deputy Gentempo released the hold once DHMC security personnel arrived and placed a spit hood on Mr. Finn (ECF No. 85-5 at 68:8–16; ECF No. 85-7, ¶ 17). After the spit hood was placed, Deputy Gentempo and a third deputy on scene helped Mr. Finn off the ground and secured him inside the van (ECF No. 85-7, ¶ 21; *see* ECF No. 85-15). Mr. Finn was then transported back to DDC; as he waited in the DDC's intake area, Mr. Finn had another seizure and collapsed to the floor on his right side (Def's Ex. S, 00:03:49; *see* ECF No. 85-13, ¶ 5).

Two days after the DHMC incident and Mr. Finn's subsequent seizure in the intake area, Nurse Loretta Lindsey treated Mr. Finn at DDC (ECF No. 85-13, ¶ 2; *see* ECF No. 85-2 at 3).

---

[4] A mandibular angle pressure point hold is a law enforcement technique in which an officer applies pressure with a thumb or knuckle to a resisting subject's mandibular nerve (behind the ear on the back of the jaw) in order to gain compliance.

During their visit, Mr. Finn complained of "lumps all over his head as a result of being punched by a deputy," as well as "injuries from his shackles being too tight" (ECF No. 85-13, ¶¶ 3, 7). Nurse Lindsey did not observe any lumps on Mr. Finn's head, but she did note "one small hematoma on the right side of his head, the size of a dime," as well as "one small abrasion on [Mr. Finn's] left wrist approximately half the size of a dime, and one small abrasion on his right shin about 1 mm in length" (ECF No. 85-13, ¶¶ 4, 7). Nurse Lindsey did not observe any other visible injuries on Mr. Finn and, in view of the DHMC incident as well as Mr. Finn's multiple recent seizures, Nurse Lindsey was unable to clearly attribute the injuries she did observe to any particular source (*id.*, ¶ 9; *see id.*, ¶¶ 5, 8). Sometime later, Mr. Finn died of causes unrelated to this case (*see* ECF No. 77, ¶ 14).

After the DHMC incident, a Senior Management Analyst for the Denver Sheriff's Department's disciplinary body investigated Deputy Gentempo's use of force against Mr. Finn (*see* ECF Nos. 93-5, 93-6). In a draft version of her investigative review and findings report, the analyst originally concluded that Deputy Gentempo's "striking toward [Mr. Finn] twice in the face area was not reasonable and necessary," and further, because Mr. Finn was already restrained in handcuffs and leg irons when he began to spit, "it was not 'reasonable and necessary' to gain [his] compliance by striking toward his face, instead of moving backward and requesting a spit hood" (ECF No. 93-5). However, in the report's final version, the same analyst reversed course, finding instead that Mr. Finn's actions "caused a visceral response from Deputy Gentempo and would be expected of any other objectively reasonable deputy" (ECF No. 93-6). The analyst later said that her decision—whether Deputy Gentempo's use of force was reasonable and necessary—was "a very difficult case" (ECF No. 93-7 at 35:18–23).

5

Later in deposition, Deputy Gentempo testified that striking Mr. Finn amounted to "more than the minimum amount of force necessary" under the circumstances (ECF No. 93-1 at 198:2–19). A Denver Sheriff's Department training sergeant similarly testified that under departmental policy, strikes are generally not an appropriate first response to an inmate spitting on a deputy (*see* ECF No. 93-3 at 59:18–60:14).

As amended on December 13, 2021, the Estate's complaint alleges, pursuant to 42 U.S.C. § 1983, that Deputy Gentempo violated Mr. Finn's constitutional right to be free from excessive force (*see* ECF No. 77, ¶¶ 136–48). Deputy Gentempo filed the instant motion for summary judgment on June 12, 2023, asserting his entitlement to qualified immunity from the § 1983 excessive force claim (ECF No. 85). The Estate filed a response on July 17, 2023 (ECF No. 93), and Deputy Gentempo filed a reply on August 7, 2023 (ECF No. 99).

## II.  LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted). The factual record and reasonable inferences must be construed in the light most favorable to the nonmoving party. *Self*, 439 F.3d at 1230.

The moving party bears the initial burden, but this burden may be discharged by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). After that, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set

6

forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986) (alteration and internal quotation marks omitted). Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

### III. ANALYSIS

In the motion, Deputy Gentempo advances two principal arguments: (i) Deputy Gentempo is entitled to qualified immunity, which would shield him from the Estate's § 1983 excessive force claim, and (ii) given the limits prescribed in Colorado's survival statute, the Estate is not entitled to recover noneconomic compensatory damages on behalf of the decedent, Mr. Finn. The Court addresses, and ultimately rejects, these arguments in turn.

#### A. Qualified Immunity

Qualified immunity protects individual state actors from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). "Because of the underlying purposes of qualified immunity, courts treat qualified-immunity questions differently from other questions on summary judgment." *Gibson v. Brown*, No. 16-cv-2239-MSK-STV, 2019 WL 4450238, at *3 (D. Colo. Sept. 17, 2019) (citing *Thomas v. Durastanti*, 607 F.3d 655, 662 (10th Cir. 2010)). "Once a defendant asserts qualified immunity, the burden shifts to the plaintiff, who must: (1) show facts that 'make out a violation of a constitutional right,' and (2) establish that, at the time of the conduct at issue, it was clearly established under existing law that the defendant's conduct breached the constitutional right." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The court may address these prongs in whichever order is best suited to the case. *See id.*

7

At the summary judgment stage of cases involving qualified immunity defenses, it is generally the district court's role "to determine which facts a jury could reasonably find from the evidence presented to it by the litigants." *Est. of George v. City of Rifle, Colo.*, No. 22-1355, 2023 WL 7395224, at *10 (quoting *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010)); *accord Johnson v. Jones*, 515 U.S. 304, 313 (1995). Put differently, the district court—resolving all factual disputes and reasonable inferences in the nonmovant's favor—outlines "the version of events that it holds a reasonable jury could credit." *Est. of George*, 2023 WL 7395224, at *10 (citation and internal quotation marks omitted). After doing so, the district court then considers "whether those facts suffice to show a violation of law and whether that law was clearly established at the time of the alleged violation." *Id.* (citation omitted).

With these standards in mind, the Court examines each of the two qualified immunity prongs in turn.

> *1. The facts—as a reasonable jury could find them—show that Deputy Gentempo's conduct violated the Fourteenth Amendment prohibition against excessive force.*

For all practical purposes, the first prong of the qualified immunity analysis—the question of whether the evidence shows a violation of a constitutional right—is the same as the determination of whether the Estate has come forward with sufficient evidence to establish a *prima facie* claim. *Gibson*, 2019 WL 4450238, at *3. In both contexts, the Estate must come forward with sufficient evidence which, if true, would demonstrate a cognizable claim. *Id.* And, as earlier

discussed, the Court construes the evidence and draws all reasonable inferences in the Estate's favor. *See Self*, 439 F.3d at 1230.

Pertinent here, because punishment is never constitutionally permissible for presumptively innocent individuals awaiting trial, the Fourteenth Amendment[5] "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). As such, a plaintiff may demonstrate that he was subjected to excessive force constituting impermissible punishment by showing either that (1) the defendant's actions were taken with an "expressed intent to punish," or (2) in the absence of such express intent, the defendant's actions were not "rationally related to a legitimate nonpunitive governmental purpose" or were "excessive in relation to that purpose." *Bell v. Wolfish*, 441 U.S. 520, 538, 561 (1979); *accord Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013).

The standard for evaluating a pretrial detainee's excessive force claim "is solely an objective one." *Kingsley*, 576 U.S. at 397. In turn, to assess the objective "reasonableness or unreasonableness of the force used," courts look to the following factors: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity

---

[5] Deputy Gentempo argues, and the Estate appears to concede, that the Fourth Amendment does not apply in this case because Mr. Finn was a "pretrial detainee," not an "arrestee," at the time of Deputy Gentempo's use of force (*see* ECF No. 85 at 11; ECF No. 93 at 12–13). Understandably, the Estate now seeks to pursue this excessive force claim under the Fourteenth Amendment, even though the First Amended Complaint invoked only the Fourth Amendment (*see* ECF No. 77). Pertinent here, "when the plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment, [courts] turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities." *Est. of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (citation omitted). And of note, while the Estate has technically only raised the Fourth Amendment, there is no practical difference in the application of the legal framework between the Fourth or Fourteenth Amendment in this case. *See McCowan v. Morales*, 945 F.3d 1276, 1283 n.6 (10th Cir. 2019). As such, substitution will be allowed, and the Court will analyze the "constitutional violation" prong according to the strictures of the Fourteenth Amendment.

of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id.* at 398. These factors are not exclusive but merely "illustrate the types of objective circumstances potentially relevant to a determination of excessive force." *See id.*; *accord Wise v. Caffey*, 72 F.4th 1199, 1206 (10th Cir. 2023) (internal quotations omitted).

Here, Deputy Gentempo argues that his use of force against Mr. Finn was not objectively unreasonable,[6] particularly in view of (i) Mr. Finn's continuous spitting or threats to spit, and (ii) the relatively minimal extent of Mr. Finn's injuries (*see* ECF No. 85 at 12–18). In response, the Estate argues that the force Deputy Gentempo used—punching Mr. Finn in the face at least twice and slamming his wheelchair to the ground, despite Mr. Finn's restraint in handcuffs and leg irons—either bore no reasonable relationship to, or was excessive in relation to, his objective of mitigating any threat posed by Mr. Finn's spitting (*see* ECF No. 93 at 15–19). Applying the *Kingsley* factors to the disputed facts of this case and viewing the available evidence in the Estate's favor, a reasonable jury could find that Deputy Gentempo's use of force was objectively unreasonable.[7]

For one thing, a jury could conclude that Deputy Gentempo punching Mr. Finn and flipping his wheelchair onto the pavement was unrelated to his purported interest in preventing Mr. Finn from spitting at or on the deputies. For instance, aside from what the jury could glean from the

---

[6] Deputy Gentempo's argument on this point, however, is of limited use to the Court, chiefly because he relies on the older test set forth in *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230 (10th Cir. 2003), requiring an analysis of three factors: "(1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted, and (3) the motives of the state actor." *Id.* at 1243. That test has since been supplanted by the Fourteenth Amendment excessive force test articulated by the U.S. Supreme Court in *Kingsley*, which eliminates the subjective inquiry and focuses instead on the presence of "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *See Colbruno v. Kessler*, 928 F.3d 1155, 1163 (10th Cir. 2019) (quoting *Kingsley*, 576 U.S. at 398).

[7] As detailed above, the facts surrounding Deputy Gentempo's use of force against Mr. Finn are disputed. The analyst working for the Denver Sheriff's Department's disciplinary body indicated this was a factually "difficult case," and her reports reflect the same (ECF No. 93-5; ECF No. 93-6; ECF No. 93-7 at 35:18–23).

DHMC surveillance footage itself (*see* Def's Ex. I; Pl's Ex. 4), Denver's disciplinary analyst described Deputy Gentempo's use of force as a "visceral response" to being spit on—i.e., a knee-jerk reaction that was not tethered to any law enforcement need, but was instead retaliatory or punitive in nature (*see* ECF No. 93-6).

Similarly, a jury could conclude that Deputy Gentempo's use of force was excessive in relation to his purported need to gain Mr. Finn's compliance. Indeed, Deputy Gentempo himself conceded that striking Mr. Finn constituted "more than the minimum amount of force necessary" to stop him from spitting, and a Denver training sergeant largely agreed, explaining that strikes are generally not an appropriate first response to an inmate spitting on a deputy (ECF No. 93-1 at 198:2–19; ECF No. 93-3 at 59:18–60:14). *See Kingsley*, 576 U.S. at 398 ("the relationship between the need for the use of force and the amount of force used," as well as "any effort made by the officer to temper or to limit the amount of force," are relevant to the determination whether force was objectively unreasonable). Moreover, the threat Mr. Finn posed to the deputies essentially amounted to an assault via bodily fluids—he did not threaten flight, attempt or threaten to strike, kick, or wield his handcuffs or leg irons as weapons, stand up from the wheelchair, or otherwise indicate any intent to inflict serious or fatal bodily harm. In that light, a jury could view Deputy Gentempo's punches as an excessive or disproportionate response to a primarily dignitary (albeit unsanitary) harm. *See Kingsley*, 576 U.S. at 398 ("the severity of the security problem at issue" and "the threat reasonably perceived by the officer" also inform whether force was objectively unreasonable).

Numerous federal authorities bear out the conclusion that force applied against restrained persons, even when they spit on officers, is excessive. *See, e.g.*, *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 412 (6th Cir. 2015) (affirming denial of summary judgment where the officer

shoved a handcuffed detainee face-first into a wall after the detainee spit on him); *Shumate v. Cleveland*, 483 F. App'x 112, 114 (6th Cir. 2012) (affirming denial of qualified immunity where the officer struck a restrained arrestee after the arrestee spit on him); *accord Igsett v. Boone*, No. 8:11-02783-CMC-JDA, 2013 WL 773070, at *3 (D.S.C. 2013) ("[T]his court cannot say, as a matter of law, that punching a pretrial detainee three (3) times in the jaw after being spit on by the detainee is an action taken in good faith to restore order.").

In sum, a reasonable jury could find that Deputy Gentempo's use of force "[was] not rationally related to a legitimate governmental objective or that it [was] excessive in relation to that purpose." *Colbruno*, 928 F.3d at 1163; *Kingsley*, 576 U.S. at 398. Accordingly, the Estate has come forward with sufficient evidence to constitute a Fourteenth Amendment excessive force violation.

> *2. The Fourteenth Amendment's prohibition against excessive force amounting to punishment was clearly established at the time of the DHMC incident.*

As to the second qualified immunity prong, a right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (quoting *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1196–97 (10th Cir. 2010)). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Wilson v. Layne*, 526 U.S. 603, 615 (1999). While a plaintiff need not cite a case directly on point, he still must show that the law would have informed a reasonable officer in the defendant's position that his conduct was unlawful in that situation. *See Knopf v. Williams*, 884 F.3d 939, 949 (10th Cir. 2018) (citation omitted). General constitutional principles may sometimes constitute clearly established law in novel factual situations. *Knighten v. Ramsey*, No. 22-5078,

2023 WL 2998424, at *3 (10th Cir. Apr. 19, 2023). Similarly, "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).

In the Tenth Circuit, it is clearly established that when a person is restrained and not violently resisting, the application of physical force is unreasonable. For instance, in *McCoy v. Meyers*, 887 F.3d 1034 (10th Cir. 2018), the plaintiff alleged that officers brought him to the ground, handcuffed his arms behind his back, zip-tied his legs together, placed him in a seated position, and rendered him unconscious using a carotid control hold. *Id.* at 1038. When the plaintiff regained consciousness, the officers resumed striking him and placed him into a second carotid control hold, rendering him unconscious again. *Id.* There, the Court determined that a reasonable jury could find that the force officers applied after restraining the suspect was excessive. *Id.* at 1049–52. Critically, the Court concluded that the suspect had been restrained so that he no longer posed an immediate threat of physical violence, nor was he capable of defending himself. In that light, the Court held that its precedent "made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment." *Id.* at 1052; *accord Casey*, 509 F.3d at 1286; *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008).

Closely related, in *Wells v. City of Dearborn Heights*, 538 F. App'x 631 (6th Cir. 2013), the Sixth Circuit confronted a similar issue when a restrained suspect was tased after shouting profanities at officers and "attempting to turn around onto his back." *Id.* at 638. The district court initially concluded that the tasing was reasonable, as the suspect "was not complying with the officers' orders to stop struggling and remain on the ground." *Id.* The Sixth Circuit reversed, explaining it is "clearly establish[ed] that it is unreasonable to use significant force on a restrained

13

subject *even if some level of passive resistance is presented.*" *Id.* (emphasis added). This is especially true when the suspect is already handcuffed. *See id.* Indeed, the court explained it is unconstitutional to use "[n]on-lethal, temporarily incapacitating force on a handcuffed suspect who no longer poses a safety threat or flight risk." *Id.* The Eighth Circuit concluded similarly in *Henderson v. Munn*, 439 F.3d 497 (8th Cir. 2006), reasoning that it is clearly established, and has been for at least ten years, that when a person is restrained with handcuffs, an act of violence is unreasonable. *Id.* at 503 (holding that pepper spray was an excessive use of force in response to a handcuffed detainee).

Deputy Gentempo contends there is no Tenth Circuit precedent squarely on point[8] showing what level of force is appropriate in response to being spit on by a detainee, and that other federal courts have held that an officer may use the same level of force that Deputy Gentempo employed in this case (*see* ECF No. 85 at 13–15). But the cases cited by Deputy Gentempo differ significantly—that is, they all involved subjects who were noncompliant or violently resisting *in addition to* spitting or threatening to spit at officers. *See generally Barnes v. Alves*, 58 F. Supp. 3d 296 (W.D.N.Y. 2014) (inmate who swung handcuffs at officers); *Lopez v. Reynolds*, 998 F. Supp. 252 (W.D.N.Y 1997) (inmate noncompliant with officers' efforts to remove his restraints); *Prymer v. Ogden*, 29 F.3d 1208 (7th Cir. 1994) (inmate who physically fought and struck officers); *Yarborough v. Loftis*, No. 6:14CV950, 2017 WL 9288033 (E.D. Tex. Oct. 18, 2017) (inmate noncompliant with officers' orders to rise from table and show identification). By contrast, this case involves a pretrial detainee who, at the time he was punched and slammed onto the ground, was completely restrained, seated in a wheelchair and, while he was spitting, otherwise posed *no threat of violence or serious bodily harm*. Thus, even though Mr. Finn spat at and on Deputy

---

[8] The parties appear to agree that there exists no Tenth Circuit or Supreme Court precedent addressing the exact fact pattern Deputy Gentempo confronted (*see* ECF No. 85 at 13; ECF No. 93 at 20).

Gentempo, the relevant law does not support the conclusion that Mr. Finn posed a threat justifying the level of force with which Deputy Gentempo responded.

In sum, the law at the time of Deputy Gentempo's conduct was clearly established so as to put him on notice that striking a spitting but otherwise nonviolent detainee would constitute a Fourteenth Amendment excessive force violation.

* * *

Viewing the evidence and drawing all reasonable inferences in the Estate's favor, it has established that a reasonable jury could find that Deputy Gentempo violated Mr. Finn's constitutional right to be free from excessive force, and the Court finds that this right was clearly established at the time of the DHMC incident. Accordingly, Deputy Gentempo is not entitled to qualified immunity.

### B. Noneconomic Damages

In his Report and Recommendation on Defendant's Motion to Dismiss (ECF No. 32), United States Magistrate Judge S. Kato Crews recommended denying the motion to the extent that it sought to preclude the Estate's recovery of noneconomic damages under Colorado's survival statute, C.R.S. § 13-20-101, since this amounted to an improper request for declaratory relief (ECF No. 59 at 12–13). No party challenged this portion of the Magistrate Judge's Recommendation, and the Court affirmed and adopted it accordingly (*see* ECF No. 71). In the instant motion, Deputy Gentempo renews his request for a ruling on the issue of whether the Estate may recover noneconomic damages when Mr. Finn passed away due to causes unrelated to the DHMC incident (ECF No. 85 at 20). Deputy Gentempo further asserts that any recovery by the Estate is limited by § 13-20-101, which bars noneconomic compensatory damages in civil survival actions (*see id.*).

In survival actions, "42 U.S.C. § 1988(a) requires the application of state-law survival remedies in § 1983 actions unless those remedies are inconsistent with the Constitution and laws of the United States." *Jefferson v. City of Tarrant, Ala.*, 522 U.S. 75, 79 (1997) (citing *Robertson v. Wegmann*, 436 U.S. 584, 588–90 (1978)) (internal quotation marks omitted). In determining whether state law survival remedies are inconsistent with federal law, "courts must look not only at particular federal statutes and constitutional provisions, but also at the policies expressed in them." *Robertson*, 436 U.S. at 590 (quotation marks and alteration omitted).

Colorado state law survival remedies are inconsistent with federal law. It is undisputed that under § 1983, noneconomic compensatory damages are recoverable when a constitutional violation causes the death of a plaintiff. *Berry v. City of Muskogee, Okla.*, 900 F.2d 1489, 1501 (10th Cir. 1990). However, there is no controlling authority resolving the question of whether Colorado's limitation in C.R.S. § 13-20-101 bars recovery of such damages when a plaintiff's death is unrelated to the alleged § 1983 violation. A federal jury in this district recently awarded $3.41 million in damages, including non-economic compensatory damages, even though the original plaintiff died of causes unrelated to the lawsuit. *See Franco v. City of Boulder*, No. 1:19-cv-02634, Jury Instruction No. 38 (D. Colo. Oct. 22, 2021) (permitting jury to award compensatory damages for, *inter alia*, "emotional pain and any mental anguish").

The U.S. Supreme Court has made clear that the availability of compensatory damage awards supports the goals of § 1983: compensation and deterrence. *Carey v. Piphus*, 435 U.S. 247, 256-7 (1978). The Court has explained there is "no more formidable deterrent" than compensatory damages. *Id.* "The purpose of § 1983 would be defeated if injuries caused by the deprivation of constitutional rights went uncompensated simply because" of a deficiency in state tort law. *Id.* at 258; *see also Williams*, 915 F. Supp. at 1077.

Indeed, there are numerous cases in other federal courts considering the availability of compensatory damages under § 1983 where the state survival statute prohibits them.[9] For instance, in *Williams v. City of Oakland*, 915 F. Supp. 1074 (N.D. Cal. 1996), the court held, as a matter of first impression, that California's state survivorship statute, which like the Colorado statute precluded recovery for pain and suffering, was inconsistent with § 1983. *Id.* at 1078–79. As such, the plaintiff could recover compensatory damages even though the decedent's passing was unrelated to the alleged § 1983 violation. *Id.* The court reasoned that barring noneconomic damages in § 1983 actions where the decedent passed from unrelated causes is "inimical to, and therefore inconsistent with, the purposes of Section 1983." *Id.* Similarly in *Briggs v. County of Maricopa*, No. CV-18-02684-PHX-EJM, 2020 WL 3440288 (D. Ariz. June 23, 2020), a district court considered whether an Arizona statute prohibited the recovery of pre-death pain and suffering damages by a substituted party where the defendant did not cause the decedent's passing. The court held that to deny recovery under these circumstances would be inconsistent with the twin policy goals of compensation and deterrence underlying § 1983. *Id.* at *6.

Here, barring noneconomic damages where Mr. Finn died of causes unrelated to the alleged constitutional violation would be contrary to the purposes of § 1983. "The policies underlying § 1983 include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law." *Dennis v. Higgins*, 498 U.S. 439, 444 (1991). Section 1983 "was intended not only to override discriminatory or otherwise unconstitutional state laws, and to provide a remedy for violations of civil rights where state law was inadequate, but also to provide a federal remedy where the state remedy, though adequate in

---

[9] Conversely, Deputy Gentempo's reliance on *Robertson v. Wegmann*, 436 U.S. 584 (1978), is misplaced. *Robertson* considered a Louisiana statute which precluded recovery for pain and suffering where the executor of the estate did not have a close familial relationship with the decedent. That case, however, answered the question of who could bring suit. The issue here is what type of damages the Estate may recover.

17

theory, was not available in practice." *Zinermon v. Burch*, 494 U.S. 113, 124 (1990) (internal quotation marks omitted).

The availability of compensatory damages and § 1983's "fundamental purpose" of deterring the use of unreasonable force do not fall away because Mr. Finn passed away from unrelated causes. As such, notwithstanding the limits of Colorado's survival statute, the Estate may recover noneconomic compensatory damages.

## V. CONCLUSION

Consistent with the above analysis, Defendant's Motion for Summary Judgment (ECF No. 85) is DENIED.

DATED this 1st day of December 2023.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge