IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:21-cv-02160-CNS-SKC

ESTATE OF SERAFIN FINN, by and through its personal representative Melissa R. Schwartz,

    Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality and
DEPUTY JASON GENTEMPO, in his individual capacity,

    Defendants.

## ORDER

This matter comes before the Court on the City and County of Denver's ("the City's") Motion for Summary Judgment (ECF No. 87). For the following reasons, the City's Motion is GRANTED.

### I. STATEMENT OF MATERIAL FACTS[1]

This civil action arises from a 2019 incident during which Deputy Jason Gentempo used physical force against Serafin Finn[2]—who was seated in a wheelchair wearing handcuffs and leg

---

[1] The following factual recitation is drawn from the City's motion (ECF No. 87), the Estate's response (ECF No. 95), and the exhibits, affidavits, and deposition transcripts attendant with each. To the extent the parties disagree over the historical facts surrounding the scope of DSD deputies' training, the Court sets forth the relevant factual dispute for clarity. However, for purposes of the summary judgment analysis below, the Court construes these facts in the light most favorable to the Estate. *See Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).

[2] As the Court noted in its Order on Deputy Gentempo's Motion for Summary Judgment, Mr. Finn passed away due to causes unrelated to the alleged excessive force incident giving rise to this case. As such, the plaintiff in this matter is the Estate of Serafin Finn ("the Estate").

1

irons—in response to Mr. Finn spitting on Deputy Gentempo. The material facts underlying this matter are fully set forth in the Court's Order on Deputy Gentempo's Motion for Summary Judgment (ECF No. 108) and are incorporated herein.

Deputy Gentempo was employed by the Denver Sheriff's Department ("DSD") at the time of the spitting incident. In this action, the Estate has asserted a § 1983 claim for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for Deputy Gentempo's alleged use of excessive force against Mr. Finn. In particular, the Estate has maintained that DSD failed to train its deputies on appropriate uses of force and proper applications of restraints in response to spitting inmates and detainees, that DSD was deliberately indifferent to the need for additional training in these areas, and that DSD's inadequate training resulted in the violation of Mr. Finn's constitutional rights (*see* ECF No. 95 at 10–14).

The parties largely agree that DSD maintains a written use-of-force policy, which delineates various situations that may justify force, appropriate uses of force, control and tactical options, de-escalation, and situational guidance (*see generally* ECF No. 87-1). DSD's use-of-force policy contains the following pertinent provisions:

- Any use of force must be the "least amount of force required to safely accomplish a legitimate law enforcement or detention-related function" (ECF No. 87-1 at 1, 2, 7, 15; *see* ECF No. 87-3 at 186:8–187:22; ECF No. 87-5 at 17:10–20).

- Any force used must be "reasonable and necessary" for the situation (ECF No. 87-1 at 2, 5–7; *see* ECF No. 87-3 at 155:13–17; ECF No. 87-4 at 101:11–15; ECF No. 87-5 at 58:11–59:3).

- Force *may not* be used: (a) "[i]n response to an individual's verbal swearing, insults, or threats without the present ability to carry out the threat"; (b) "[t]o punish, degrade, humiliate, discipline, retaliate, improperly coerce, discriminate against, or unnecessarily cause pain or injury to an individual"; (c) "[a]fter compliance or control

- of an individual has been obtained"; or (d) "[o]n a restrained individual, including an individual who is handcuffed, except when . . . [i]t is 'reasonable and necessary' to gain compliance, [or a] circumstance requires immediately stopping or preventing a restrained individual from from injuring someone, including himself/herself, or escaping" (ECF No. 87-1 at 7).

- The use of "personal body weapon strikes" such as punches or blows delivered using hands is "approved for situations involving active aggression" (i.e., "a credible verbal or non-verbal threat or overt act of an imminent assault, coupled with the present ability to carry out the threat or assault"), but is "not authorized for situations involving psychological intimidation, verbal non-compliance, passive resistance, or defensive resistance" (ECF No. 87-1 at 3, 7–8).

- Whenever "reasonable and necessary," less lethal force may be used "[t]o prevent or stop the throwing or projection of any bodily substance including but not limited to saliva, blood, seminal fluid, urine, and feces" (ECF No. 87-1 at 6).

Similarly, DSD maintains a written use-of-restraints policy that governs the application of physical restraints like handcuffs and leg irons (*see generally* ECF No. 87-2). Pertinent here, the use-of-restraints policy provides for the use of "protective hoods" (i.e., spit hoods), which are "temporary protective devices designed to prevent a detainee or inmate from spitting or biting" (*id.* at 2). DSD's use-of-restraints policy provides, in pertinent part:

- "A protective hood may be used on a detainee or inmate that spits on or bites another person, attempts to spit on or attempts to bite another person, or who has a history of spitting or biting during the application of restraints, when physically restrained or during escort or transport. A detainee or inmate who is placed in a protective hood shall be continually monitored and observed until the protective hood is removed" (ECF No. 87-2 at 2).

- "A protective hood shall not be used on an inmate . . . if there are indications that the person has a medical condition, such as difficulty breathing or vomiting. In such cases, prompt medical care must be obtained, and the protective hood shall not be applied" (ECF No. 87-2 at 2).

3

Application of a spit hood is straightforward—the officer simply slides a nylon hood over the subject's head (ECF No. 87-5 at 73:3–11, 75:4–9).

While the contents of DSD's use-of-force and use-of-restraints policies appear in large part to be undisputed, the parties strongly disagree over the extent to which DSD trains its deputies on the application of these policies in response to spitting inmates and detainees. The City alleges that DSD deputies are trained comprehensively on the use-of-force and use-of-restraints policies (*see* ECF No. 87-3 at 24:5–25:3; ECF No. 87-4 at 23:9–25:6; ECF No. 87-5 at 14:23–26:19). In particular, DSD deputies receive both academy training and regular in-service trainings on the appropriate use of restraints, including spit hoods (*see* ECF No. 87-3 at 166:14–167:25; ECF No. 87-4 at 106:16–107:21). DSD deputies are taught how to apply a spit hood, why it may be necessary, and to closely monitor the subject after application (*see* ECF No. 87-3 at 25:10–18; ECF No 87-4 at 107:14–108:17, 109:7–10; ECF No. 87-5 at 72:18–74:3). DSD deputies also receive academy and in-service trainings on appropriate uses of force and de-escalation, including that deputies are expected to use the least amount of force necessary in any given situation (*see* ECF No. 87-3 at 186:8–187:22; ECF No. 87-5 at 14:23–17:9, 18:2–19:9, 22:5–23:5, 79:13–22). DSD training further includes realistic "scenario-based" components, during which deputies are evaluated in their response to live exercises with actors simulating various situations the deputies may encounter in the field (*see* ECF No. 87-3 at 193:7–194:24; ECF No. 87-5 at 16:13–17:9, 26:7–19).

By contrast, the Estate alleges that while DSD may train its deputies broadly on its use-of-force and use-of-restraints policies, DSD does not specifically administer training on reasonable and necessary uses of force *in response to spitting inmates or detainees*. For instance, Deputy

Gentempo testified that during training, "we never clearly went over what to do if somebody was spitting on you," and that while "we were trained on kicks, punches as far as being assaulted and how to stop that threat[,] [n]ever to my recollection has [DSD] ever trained us on what is the appropriate use of force . . . when you're being spit on" (ECF No. 85-3 at 163:2–164:1). Similarly, several DSD deputies testified that while DSD informally trains its deputies on *how* to apply a spit hood, it does not specifically administer training on *when* the situation warrants a spit hood's application (*see* ECF No. 85-3 at 25:1–18 ("There wasn't anything that we went to a class for or anything that was in a classroom setting, if I recall correctly."); *id.* at 168:9–169:21 ("Q: Have you been trained on this policy, this specific policy, 4.B 'Use of a protective hood,' had you been trained on 4.B before the incident? A: No, sir."); ECF No. 87-4 at 108:24–109:12 ("Q: During training, have you practiced with a protective hood? A: During training, no."); ECF No. 87-5 at 94:10–17 ("[I]t's very limited as to what the details are with [spit hood training]. Again, it's simple, I open the package and I put it over someone's head . . . .")). Furthermore, DSD's live "scenario-based" training does not cover spitting inmates or detainees (ECF No. 87-3 at 164:5–12; ECF No. 87-5 at 69:12–21).

In either event, the parties agree that Deputy Gentempo had never previously been spit on or at by an inmate or detainee during his 18 years in law enforcement (ECF No. 87-3 at 164:13–16). Deputy Gentempo had, however, encountered inmates spitting in their jail cells, and he knew of (though had not personally witnessed) other DSD deputies who had been spit on (*id.* at 164:17–165:13). In a similar vein, DSD deputies commonly encounter spitting inmates and detainees in the course of their work (*id.* at 123:22–124:9; ECF No. 87-4 at 68:17–69:4, 69:22–70:12). DSD deputies also encounter handcuffed and/or shackled inmates and detainees on a near-constant basis

5

(ECF No. 87-3 at 165:24–166:13; ECF No. 87-4 at 123:20–124:21). At least one other DSD deputy testified that on one occasion many years prior, an inmate had spit into his mouth (ECF No. 95-5 at 21:482–86). Aside from this, no witness who testified in this case identified another situation in which a DSD deputy used physical force in response to a spitting incident (*see generally* ECF Nos. 87-3, 87-4, 87-5). A DSD training sergeant did opine, however, that DSD needs to improve its training on appropriate responses to spitting inmates and detainees (*see* ECF No. 87-5 at 70:13–22 ("Q: [D]o you have any plans to incorporate some scenarios on spitting inmates into your training? A: You know, I think based on today, this current situation and after this incident, I think it's something that we should look at keying-in onto more, so, again, that hopefully we don't have any situations like this moving forward or people know, you know, the exact and appropriate way to respond. So, you know, I would think that moving forward we would definitely address this a little bit better . . . .").

## II.  LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted). The factual record and reasonable inferences must be construed in the light most favorable to the nonmoving party. *Self*, 439 F.3d at 1230.

The moving party bears the initial burden, but this burden may be discharged by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v.*

6

*Catrett*, 477 U.S. 317, 325 (1986). After that, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986) (alteration and internal quotation marks omitted). Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III.  ANALYSIS

In the motion, the City argues that the Estate cannot prevail on its *Monell* claim based on a failure-to-train theory, chiefly because the available evidence reveals no actionable training deficiency, no causal link between DSD's training program and Mr. Finn's injury, and no deliberate indifference on DSD's part (*see* ECF No. 87 at 10–20). The Court addresses these arguments below, ultimately agreeing with the City that summary judgment is appropriate. Before doing so, the Court briefly sets forth the law governing municipal liability claims under § 1983.

#### A.  Municipal Liability Claims

As the Court previously explained at the motion to dismiss stage (*see* ECF No. 71 at 4–6), a municipality is subject to *Monell* liability under § 1983 where (i) an official policy or custom (ii) causes a plaintiff's constitutional injury, and (iii) the policy or custom was "enacted or maintained with deliberate indifference" to a near-inevitable constitutional injury. *See Schneider*, 717 F.3d at 769 (citation omitted).

Regarding the "official policy or custom" element, the plaintiff must set forth sufficient evidence for a reasonable jury to conclude that the municipality maintains one of the following:

7

- A formal regulation or policy statement;

- An informal custom amounting to "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law";

- Decisions of employees with final policymaking authority;

- Ratification by final policymakers of the decisions of subordinates to whom authority was delegated subject to the policymakers' "review and approval"; or

- "Failure to adequately train or supervise employees," as long as the failure results from "deliberate indifference" to the plaintiff's injuries.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

Regarding the "causation" element, the plaintiff must set forth sufficient evidence for a reasonable jury to find "a direct causal link between the policy or custom and the injury alleged." *See Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (quotation omitted); *accord Bryson*, 627 F.3d at 788; *Schneider*, 717 F.3d at 770. Put differently, a municipality is not liable for the constitutional violations of its employees "simply because such a violation has occurred; a policy or custom must have actually caused that violation." *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) (citation omitted).

Finally, regarding the requisite state of mind element, the plaintiff must set forth sufficient evidence for a reasonable jury to conclude that the municipal action was taken with "'deliberate indifference' as to its known or obvious consequences." *Schneider*, 717 F.3d at 770 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407 (1997)). This standard is satisfied where the plaintiff shows that a municipality has "actual or constructive notice that its action or failure to act is substantially certain" to result in a constitutional violation, and it

"consciously or deliberately" disregards the risk of harm. *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (quotation omitted).

### B. The Estate's Failure-to-Train Claim

As set forth above, the Estate's *Monell* claim is premised on DSD's alleged failure to train its deputies on appropriate responses to spitting inmates and detainees. And of note, while "[t]he failure to provide proper training may fairly be said to represent a policy for which the [municipality] is responsible," *City of Canton v. Harris*, 489 U.S. 378, 390 (1989), nevertheless, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted); *accord Okla. City v. Tuttle*, 471 U.S. 808, 822–23 (1985) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.").

In any event, a municipality may be liable under § 1983 for failure to train its officers or employees when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. These failure-to-train claims come in two general flavors—"pattern" and "single incident." In the former, a plaintiff shows deliberate indifference by pointing to "the existence of a pattern of tortious conduct" by officers. *Barney*, 143 F.3d at 1307; *accord Connick*, 563 U.S. at 62 (deliberate indifference may be shown by a "pattern of similar constitutional violations by untrained employees"). Here, the Estate does not appear to proceed on the notion of a "pattern" of DSD deputies using excessive force in response to spitting inmates or detainees (*see generally* ECF No.

9

95). Nor could it—as noted above, there is no evidence in this case documenting *any* prior uses of force by DSD deputies during a spitting incident (*see generally* ECF Nos. 87-3, 87-4, 87-5).

This leaves the single-incident variety of failure-to-train claims. Even without proof of a preexisting pattern of constitutional violations, there remains a rare, "narrow range of circumstances" in which a "[single] violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *See Bd. of Cnty. Comm'rs,* 520 U.S. at 409. Put differently, a failure-to-train claim may be based on a single incident where, despite the lack of prior incidents, the unconstitutional consequences of failing to train are "patently obvious." *Connick*, 563 U.S. at 64. This appears to be the theory under which the Estate seeks to proceed (*see* ECF No. 95 at 10–14). And the Estate's single-incident failure-to-train claim survives summary judgment only if there is sufficient evidence for a reasonable jury to find "(1) the existence of a municipal policy or custom involving deficient training; (2) an injury caused by the policy that is obvious and closely related; and (3) that the municipality adopted the policy or custom with deliberate indifference to the injury." *Valdez v. McDonald*, 66 F.4th 796, 816–17 (10th Cir. 2023) (quoting *Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021) (alterations and internal quotation marks omitted). The Court addresses each of these elements in turn.

  1. *Inadequate Training*

In light of the standard set forth above, the Estate must first demonstrate that DSD's training program was, in fact, deficient. It is not enough "to show that there were general deficiencies in the [municipality's] training program." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). Rather, as the City correctly observes, Plaintiff must specifically "identify *how* [the]

training was inadequate" with respect to spitting inmates and detainees (ECF No. 87 at 13 (quoting *Hughes v. Kvasnicka*, No. 11-cv-02242-WYD-MJW, 2014 WL 36627, at *4 (D. Colo. Jan. 6, 2014) (emphasis added))). *Cf. Sodaro v. City & Cnty. of Denver*, 629 F.Supp.3d 1064, 1082 (D. Colo. 2022) (in the Rule 12(b)(6) context, dismissing municipal liability claim where plaintiff failed to specify "how the [o]fficers were trained, who they were trained by, or why their training was deficient").

Construing the available evidence in the Estate's favor, *see Self*, 439 F.3d at 1230, a reasonable jury could conclude that DSD's training program as to spitting inmates and detainees was inadequate. On this point, the City gestures at how deputies are trained broadly on DSD's use-of-force and use-of-restraints policies—in particular, that for *all* conceivable law enforcement situations, deputies are trained to use the least amount of force required under the circumstances, and that any force used must be reasonable and necessary (*see* ECF No. 87 at 14). The City further points to how deputies are trained in defensive tactics, de-escalation, and the proper application of spit hoods (*id.* at 13–14). But the training deficiencies the Estate identifies are much more specific than the universal use-of-force principles offered by the City—that is, according to the Estate, DSD deputies needed more or different training on exactly *what kind of physical force is appropriate when an inmate or detainee spits at or on a deputy.* For instance, Deputy Gentempo himself testified that "[DSD] never clearly went over what to do if somebody was spitting on you," and DSD's training sergeant largely agreed that DSD's training program needed to improve in this specific respect (*see* ECF No. 85-3 at 163:2–164:1; ECF No. 87-5 at 70:13–22). Likewise, multiple deputies testified that DSD's training on *when the situation warrants a spit hood's application* was, at best, minimal (*see* ECF No. 85-3 at 25:1–18, 168:9–169:21; ECF No. 87-4 at 108:24–

11

109:12; ECF No. 87-5 at 94:10–17). Accordingly, the Court finds that the Estate has met the first single-incident failure-to-train element.

    *2. Causation*

Second, the Estate must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Schneider*, 717 F.3d at 770 (citation omitted). Put differently, the Estate must explain how DSD's failure to train its deputies on appropriate responses to spitting inmates and detainees was "closely related" to Deputy Gentempo's alleged use of excessive force against Mr. Finn. *See City of Canton*, 489 U.S. at 385. And of note, "the causal link between the officers' training and the alleged constitutional deprivation is more direct than in cases in which officers are not given enough training to know the correct response to a dangerous situation." *Allen v. Muskogee, Okla.*, 119 F.3d 837, 844 (10th Cir. 1997).

The Estate's failure-to-train claim flounders here, as no evidence has been provided as to how DSD's training on spitting inmates and detainees (or lack thereof) actually resulted in the excessive force at issue in this case. Instead, the Estate simply engages in the *post hoc, ergo propter hoc* fallacy: "Having encountered a spitting arrestee, Deputy Gentempo had no training on the appropriate response, so he delivered several strikes to Mr. Finn's face then pounded him to the pavement" (ECF No. 95 at 13). *See Carr v. Castle*, 337 F.3d 1221, 1231 (10th Cir. 2003). The Estate goes on to speculate that, with the benefit of adequate training, Deputy Gentempo "could have . . . used a control technique while another officer applied a spit sock," or otherwise "would have chosen a different, constitutionally appropriate response" (ECF No. 95 at 13–14). That the Estate has identified, with the omniscience of hindsight, other options on the menu of responses available to Deputy Gentempo does nothing to demonstrate that his inadequate training led directly

12

to his use of excessive force against Mr. Finn. In other words, even if the evidence is viewed from the most favorable perspective in terms of DSD deputies not having been trained to know exactly how to react to being spit at or on, the Estate has failed to show how this was a direct cause of Deputy Gentempo's actions. As such, the Court finds that the Estate's failure-to-train claim lacks the requisite causation.

### 3. Deliberate Indifference

Assuming *arguendo* that the Estate had succeeded in meeting the causation requirement above, it would still need to demonstrate that DSD failed to train its deputies in a manner constituting "deliberate indifference" to citizens' constitutional rights. *See City of Canton*, 489 U.S. at 385. In the single-incident context, deliberate indifference is established where "(i) the municipality's policymakers know to a moral certainty that their employees will confront a given situation; (ii) the situation presents the employee with a difficult choice of the sort that training or supervision will make less difficult; and (iii) the wrong choice will frequently cause the deprivation of a citizen's constitutional rights." *Valdez*, 66 F.4th at 817 (quoting *Lance*, 985 F.3d at 802) (alterations and internal quotation marks omitted).

Here, the Estate's evidence does tend to show that DSD knew "to a moral certainty" that its deputies would encounter spitting inmates and detainees (ECF No. 87-3 at 164:17–165:13, 123:22–124:9; ECF No. 87-4 at 68:17–69:4, 69:22–70:12; ECF No. 95-5 at 21:482–86), as well as inmates and detainees who are restrained in handcuffs and/or leg irons (ECF No. 87-3 at 165:24–166:13; ECF No. 87-4 at 123:20–124:21). But on the remaining single-incident deliberate indifference elements, the Court finds itself in agreement with the City (*see* ECF No. 87 at 17–18). The Estate's briefing is wholly devoid of evidence suggesting that spitting inmates and detainees

13

present DSD deputies with any "difficult choice" as to what kind of force is authorized in response—let alone a choice that would be aided by additional training. Likewise, there is no basis in the evidence to find that deputies who make the "wrong choice" in response to spitting will "frequently" violate the rights of inmates or detainees in their custody. Put simply, the spitting incident giving rise to this case does not fall within the "narrow range of circumstances" where Deputy Gentempo's alleged excessive force was a "highly predictable" or "patently obvious" consequence of his deficient training. *See Bd. of Cnty. Comm'rs,* 520 U.S. at 409; *Connick*, 563 U.S. at 64. As such, the Court finds that the Estate's failure-to-train claim also falls short of the deliberate indifference element.

* * *

Viewing the evidence and drawing all reasonable inferences in the Estate's favor, it has not established that a reasonable jury could find DSD's training program was deficient in a manner giving rise to *Monell* liability under § 1983. Accordingly, summary judgment in the City's favor is warranted.

### IV.  CONCLUSION

Consistent with the above analysis, the City and County of Denver's Motion for Summary Judgment (ECF No. 87) is GRANTED.

DATED this 1st day of December 2023.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge

14